UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
Harrisonburg Division

| | | |
|---|---|---|
| RICHARD R. CADMUS, JR., | ) | |
| Plaintiff, | ) | Civil Action No. 5:15-cv-00045 |
| | ) | |
| v. | ) | REPORT & RECOMMENDATION |
| | ) | |
| ROBERT T. WILLIAMSON, *et al.*, | ) | By:    Joel C. Hoppe |
| Defendants. | ) | United States Magistrate Judge |

Plaintiff Richard R. Cadmus, Jr., proceeding *pro se*, has filed this action against the
following Defendants: Robert T. Williamson, individually and in his official capacity as Sheriff
of Frederick County; Doug Nicholson, individually and in his official capacity as a Deputy
Sheriff of Frederick County; Aimee Cook, individually and in her official capacity as a
Magistrate of Frederick County; John and Jane Does 1 through 25, individually and in their
official capacities as Deputy Sheriffs of Frederick County; and the Frederick County Sheriff's
Department ("FCSD"). Compl., ECF No. 2. In response to Cadmus's Complaint, Defendants
Williamson, Cook, and Nicholson each filed Motions to Dismiss pursuant to Rule 12(b)(1) and
(6) of the Federal Rules of Civil Procedure, which are pending before the Court. ECF Nos. 14,
22, 25. Also pending before the Court is Cadmus's Motion for Leave to Amend his Complaint,
with a Proposed Amended Complaint attached. Pl. Mot. to Am. & Proposed Am. Compl., ECF
No. 29. These motions are before me by referral for report and recommendation under 28 U.S.C.
§ 636(b)(1)(B). ECF No. 5. All parties have fully briefed the issues, I have heard oral argument,
and the motions are ripe for decision. After considering the pleadings, the parties' briefs and oral
arguments, and the applicable law, I find that Cadmus has failed to state a claim that entitles him
to relief and that his Proposed Amended Complaint is, for most of his claims, futile. I therefore
recommend that the presiding District Judge grant the Defendants' Motions to Dismiss and deny

1

leave to file the Proposed Amended Complaint. I also recommend that the presiding District Judge grant Cadmus leave to file another amended complaint, subject to the limitations set out in this Report and Recommendation.

## I. The Original Complaint and Motions to Dismiss

A.      *Factual Allegations and Claims*

When assessing factual allegations for a motion to dismiss, I must view all well-pled facts in the Complaint in the light most favorable to the plaintiff. *Philips v. Pitt Cty. Mem'l Hosp.*, 572 F.3d 176, 180 (4th Cir. 2009). In recognition of Cadmus's *pro se* status and my obligation to hold his pleadings to "less stringent standards than formal pleadings drafted by lawyers," *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (per curiam), I will also consider facts presented in his brief in opposition. *Shomo v. Apple, Inc.*, No. 7:14cv40, 2015 WL 777620, at *2 (W.D. Va. Feb. 24, 2015) (considering "both the complaint and the factual allegations in Shomo's response to the motion to dismiss in determining whether his claims can survive dismissal"); *Christmas v. Arc of the Piedmont, Inc.*, No. 3:12cv8, 2012 WL 2905584, at *1 (W.D. Va. July 16, 2012) (accepting as true facts from a *pro se* plaintiff's complaint and brief in opposition to decide a motion to dismiss); *Davis v. Bacigalupi*, 711 F. Supp. 2d 609, 615 (E.D. Va. 2010) (same) (collecting cases).

1.      *The June 9, 2013 Incident*

Cadmus's original Complaint sets forth a long, somewhat meandering series of allegations against the Defendants. He describes a number of distinct events giving rise to his claims—the first and arguably most central of which began with a domestic incident on June 9, 2013, at the home where Cadmus lived with his mother, Laura Fabrizio. Compl. ¶ 16. Cadmus alleges that at the time, Fabrizio was terminally ill, took large doses of pain medication, and

suffered from significant mental health symptoms, including hallucinations, paranoia, and dementia. *Id.* ¶¶ 16–18. Fabrizio required round-the-clock assistance with personal necessities; Cadmus acted as her caretaker and held her power of attorney. *Id.* ¶¶ 16, 19.

On that date, Cadmus was heading home for lunch when he received a text message from Laura Lee Carver, his sister,[1] stating that she was at the house. *Id.* ¶¶ 20, 34. Carver's treatment of Fabrizio was a point of contention between her and Cadmus—Cadmus alleges that Carver had previously been charged with stealing from their mother, *id.* ¶ 32, and he had reported her to Social Services for elder abuse, *id.* ¶ 33. Carver was reportedly upset at this time over Cadmus's meeting with a social worker. *Id.* ¶ 34. When Cadmus arrived at the house, he got into a verbal argument with Carver and her boyfriend, *id.* ¶¶ 20–22, who is identified in later filings as Matthew Sirbaugh, Proposed Am. Compl. ¶¶ 138, 159. Cadmus alleges that he asked Carver and Sirbaugh to leave because the argument had upset Fabrizio. Compl. ¶ 21. When Cadmus attempted to go out to the back porch to speak to his mother, Sirbaugh physically attacked him and prevented him from going out the back door. *Id.* ¶¶ 22–23, 34.

After the altercation between Cadmus and Sirbaugh, Cadmus went out to the front yard to call 911. *Id.* ¶ 23. When Sirbaugh saw Cadmus call 911, he also called 911. *Id.* Cadmus subsequently called the FCSD to ask when officers would arrive and provided additional details about the incident. *Id.* Nicholson and two unidentified deputies arrived approximately ten minutes after Cadmus's second call. *Id.* ¶ 24. When the deputies arrived, Sirbaugh ran out to meet them in front of the house and began giving an account of the events. *Id.* Cadmus characterizes Sirbaugh's account as false. *Id.* Cadmus alleges that as the deputies investigated the

---

[1] In an affidavit attached to Cadmus's Proposed Amended Complaint, Carver states that she is Cadmus's half-sister. Carver Aff. ¶ 2, ECF No. 29-2. Fabrizio was the mother of both Cadmus and Carver. *Id.*

3

incident, they treated him much more harshly than they treated Carver and Sirbaugh. *Id.* ¶¶ 25–27. He claims that the deputies treated him as the primary suspect from the beginning and accused him of lying and giving inconsistent statements, while accepting Carver's and Sirbaugh's statements as true. *Id.* ¶ 25. Cadmus objected to the deputies' questioning of Carver and Sirbaugh in the same room, which he claims allowed them to corroborate each other's statements and implicate him as the aggressor. *Id.* ¶¶ 26–27. Carver and Sirbaugh stated that Cadmus was on drugs, was "raging and violent," and had told Carver that things were "going to get ugly." *Id.* ¶ 30. Carver also showed Nicholson a scratch on her upper arm. *Id.* Cadmus claims that although he was compliant and cooperative, the deputies accused him of being disruptive, and one of them threatened to charge him with obstruction of justice. *Id.* ¶ 25.

When the deputies eventually asked Cadmus for his version of events, he expressed his displeasure over their manner of questioning, *id.* ¶ 29, then told them that Carver could not be trusted because of her history of heroin use and thefts from Fabrizio, *id.* ¶ 32. Although Cadmus urged the deputies to look further into these claims, they did not do so. *Id.* Cadmus related his version of events to the deputies, claiming that he was the one who had been assaulted during the altercation. *Id.* ¶ 34. He also explained that he was his mother's caretaker and that she was in serious need of supervision. *Id.* ¶ 31. One of the deputies told Cadmus that his story did not add up and that he was lying. *Id.* ¶ 36. This made Cadmus feel that the deputies were conspiring against him, so he went upstairs to get his phone to record the rest of the encounter. *Id.* ¶¶ 36–37. When Cadmus came back down and attempted to record the incident, one of the deputies told him he could not do so. *Id.* ¶ 38. Nicholson asked Cadmus if he had any injuries, and as Cadmus explained that he had injuries to his legs and back, the deputies surrounded Cadmus, instructed him to place his hands behind his back, and placed him in handcuffs. *Id.* ¶¶ 38–39, 43. As he was

being arrested, he noted that Carver and Sirbaugh were making statements that implicated Cadmus as having assaulted both of them. *Id.* ¶ 40.

Nicholson placed Cadmus in the back of his patrol vehicle and drove him to the Northwest Regional Adult Detention Center ("NRADC"). *Id.* ¶ 44. During the ride to the NRADC, Cadmus again urged Nicholson to look into his sister's history of drug use and theft, but Nicholson did not do so. *Id.* ¶ 45. Instead, Nicholson commented to Cadmus that he believed Cadmus to be on drugs and noted that he was aware that Cadmus was involved in activism in the community, which included leading a taxicab strike against the City of Winchester and a lawsuit against the City's Chief of Police.[2] *Id.* ¶¶ 46–47. Nicholson also recalled past encounters with Cadmus, including a time he witnessed Cadmus litigating a traffic ticket against another deputy and a prior case during which he accompanied Cadmus's ex-fiancée to file charges against Cadmus. *Id.* ¶¶ 49–51. Nicholson expressed his belief that Cadmus was never held accountable for his actions, stating to him, "Mr. Cadmus, it's never you. It's always someone else." *Id.* ¶ 49. Cadmus interpreted these comments as suggesting that Nicholson would "take the law into his own hands and make sure that Cadmus was held criminally accountable for something." *Id.* ¶ 53. Cadmus also asserts that his handcuffs were too tight and caused him pain, but when he complained about this to Nicholson he did not adjust them. *Id.* ¶¶ 55–56.

Once they arrived at the NRADC, Nicholson escorted Cadmus to a holding room. *Id.* ¶ 57. When Cadmus asked if Nicholson had any evidence that Cadmus assaulted anyone, Nicholson showed Cadmus a picture he had taken of scratches on Carver's upper arm. *Id.* ¶ 30, 57. Cadmus told Nicholson that his fingernails were too short to have caused those scratches, and Nicholson took a picture of Cadmus's fingers. *Id.* ¶¶ 58–61. Nicholson then brought Cadmus

---

[2] Cadmus notes that he and Fabrizio had a history of activism regarding law enforcement accountability. *Id.* ¶ 14.

before Cook for a preliminary hearing. *Id.* ¶ 62. For several minutes prior to the hearing, Nicholson and Cook discussed Cadmus's arrest at the magistrate window, but did not allow Cadmus to stand there as well. *Id.*

Cook then issued arrest warrants for Cadmus based on a written complaint submitted by Nicholson, which Cadmus contends did not establish probable cause. *Id.* ¶ 63. Cook also recalled to Cadmus that she had previously issued warrants for the charges brought by Cadmus's ex-fiancée and placed him under a $3,500 bond based on his alleged history of violence. *Id.* ¶ 63–64. Cadmus objected to both the earlier charges and his current ones, to no avail. *Id.* ¶¶ 64–65. Nicholson walked by Cadmus as he left, repeating his earlier statement that Cadmus did not take responsibility for his actions. *Id.* ¶ 66. Cadmus subsequently paid for bond, went to the emergency room to get treatment for his injuries, and took a drug screening test, which came back negative. *Id.* ¶ 67. As a result of the charge, an emergency protective order was put in place that barred Cadmus from contact with Fabrizio. *Id.* ¶ 68. Cadmus states that the charges eventually ended in a favorable disposition towards him. *Id.* ¶ 78.

   *2.*   *Subsequent Events*

Cadmus subsequently filed a complaint against Nicholson with the FCSD, alleging that the investigation and arrest were motivated by Nicholson's preexisting attitude toward Cadmus. *Id.* Cadmus also complained that he did not feel comfortable around Nicholson and requested that, in the event of any future investigations involving Cadmus, Nicholson either not take part or be accompanied by a supervisor. *Id.* In response to Cadmus's complaint, Lieutenant Rick Singhas sent Cadmus a letter, which stated that the allegations against Nicholson were unfounded. *Id.* Cadmus met with three other management-level captains at FCSD who also decided the complaints were unfounded and took no action. *Id.*

Cadmus also filed a request under the Virginia Freedom of Information Act ("FOIA") for records of the 911 calls made on June 9, 2013. *Id.* ¶ 69. He claims that the FCSD changed the dispatch log and erased the audio recording of Cadmus's first call to make it appear that Sirbaugh, rather than Cadmus, was the first person to call 911. *Id.* ¶¶ 69, 71. Cadmus also complains of other incidents in which deputies went to his home. He claims that in August 2013, he arrived at home and found Nicholson there conducting an investigation, which Cadmus claims was unrelated to him, but nonetheless caused him extreme fear and physical and emotional pain and turmoil. *Id.* ¶ 72. He also states that at another time three deputies arrived in cruisers at his home at 3:00 a.m. and knocked on the door. *Id.* ¶ 73. Cadmus did not answer because he was afraid of the deputies' intentions, but he later found out they were there to serve a summons for a parking ticket. *Id.* Finally, he alleges that in April 2015, deputies entered Cadmus's home over his objection, once again to serve him with a summons for parking tickets. *Id.* ¶ 74. One of the deputies threatened to arrest Cadmus after Cadmus refused to show him identification, and the situation remained unresolved until a supervisor arrived and handed Cadmus the summons. *Id.*

 *3. Claims*

   Cadmus brings his Complaint pursuant to 42 U.S.C. §§ 1983, 1985, and 1988; the Fourth, Eighth, and Fourteenth Amendments to the United States Constitution; and Virginia common law. *Id.* ¶ 1. Cadmus alleges a variety of injuries resulting from the Defendants' conduct, including violations of his right against unreasonable search and seizure, loss of physical liberty, physical pain and suffering, and emotional trauma and suffering. *Id.* ¶ 75. He seeks damages,

costs, and attorney's fees.[3] *Id.* ¶ 101. He asserts seven counts against the Defendants, although it is not always clear what conduct and which parties are encompassed in each count.

Count I asserts a claim of false arrest and malicious prosecution against Nicholson and Cook for their involvement in arresting and charging him for the June 9 incident. *Id.* ¶¶ 76–79. Count II asserts a claim of unreasonable search and seizure against Nicholson and two unnamed deputies. *Id.* ¶¶ 80–82. Count III asserts a claim of conspiracy to violate civil rights and alleges that the Defendants, who are not named, agreed, prior to arriving to investigate the June 9 incident, not to be objective and to ensure that Cadmus was treated as the primary suspect. *Id.* ¶¶ 83–85.

Count IV asserts a claim for supervisory liability against Williamson and unidentified Defendants, alleging that these Defendants were deliberately indifferent to (or tacitly authorized) a pattern of retaliatory misconduct by Nicholson and other deputies. *Id.* ¶¶ 86–89. Count V asserts an equal protection claim against unnamed Defendants, alleging that they discriminated against Cadmus on the basis of his protected speech. *Id.* ¶¶ 90–91. Count VI asserts a claim for intentional infliction of emotional distress against unnamed Defendants. *Id.* ¶¶ 92–94. Finally, Count VII asserts a claim of malicious prosecution under Virginia law against Nicholson and Cook for their actions in charging him with two counts of assault and battery. *Id.* ¶¶ 95–100.

B.    *Motions to Dismiss*

Defendants argue that Cadmus's Complaint should be dismissed, pursuant to Rule 12(b)(1), for lack of subject matter jurisdiction where sovereign immunity bars Cadmus's claims and, pursuant to Rule 12(b)(6), for failing to state a claim upon which relief can be granted for all

---

[3] Cadmus also requests injunctive relief but does not specify the claim to which this request relates, the Defendant to whom any injunction should be directed, or the specific nature of his requested injunction. *Id.* ¶ 101.

8

of his other claims. Each Defendant asserts a defense of immunity from suit and in addition contends that Cadmus has failed to allege facts that would entitle him to relief.

    1.    *Sovereign Immunity*

Williamson and Nicholson both argue that Cadmus's claims against them in their official capacities must be dismissed pursuant to the doctrine of sovereign immunity under the Eleventh Amendment. They argue that immunity deprives this Court of subject matter jurisdiction. *See Trantham v. Henry Cty. Sheriff's Office*, No. 4:10cv58, 2011 WL 863498, at *3 (W.D. Va. Mar. 10, 2011) ("Although subject matter jurisdiction and sovereign immunity do not coincide perfectly, there is a recent trend among the district courts within the Fourth Circuit to consider sovereign immunity under Rule 12(b)(1).") (citations omitted). A Rule 12(b)(1) motion challenges the court's subject matter jurisdiction to hear a claim. The plaintiff bears the burden of proving subject matter jurisdiction. *Evans v. B.F. Perkins Co.*, 166 F.3d 642, 647 (4th Cir. 1999). In resolving a Rule 12(b)(1) motion, "'the district court is to regard the pleadings as mere evidence on the issue, and may consider evidence outside the pleadings without converting the proceeding to one for summary judgment.'" *Id.* (quoting *Richmond, Fredericksburg & Potomac R. Co. v. United States*, 945 F.2d 765, 768 (4th Cir. 1991)). A court should grant the motion "'only if the material jurisdictional facts are not in dispute and the moving party is entitled to prevail as a matter of law.'" *Id.*

The Eleventh Amendment provides the states immunity against suits for damages brought in federal court. *Bland v. Roberts*, 730 F.3d 368, 389 (4th Cir. 2013). In addition to immunizing the states themselves, Eleventh Amendment sovereign immunity also extends to state officials sued in their official capacities. *See Will v. Mich. Dep't of State Police*, 491 U.S. 58, 71 (1989) ("[A] suit against a state official in his or her official capacity is not a suit against

the official but rather is a suit against the official's office. As such, it is no different from a suit against the state itself." (citations omitted)). This immunity, however, does not extend to municipalities or their officials, *id.* at 70 (citing *Monell v. N.Y.C. Dep't of Soc. Servs.*, 436 U.S. 658, 690 n.54 (1978)), but instead protects only those officials and entities that are considered to be "arms of the State," *Bland*, 730 F.3d at 389–90 (citing *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 280 (1977)).

In Virginia, sheriffs are state officers whose authority is derived from the Virginia Constitution. Va. Const. art. VII, § 4; *Doud v. Commonwealth*, 717 S.E.2d 124, 126 (Va. 2011). Although they are elected by citizens of a county or municipality and perform functions that are local in nature, they are not agents of local government. *Doud*, 717 S.E.2d at 126. Similarly, deputies are agents of the sheriff, rather than agents of the local governing body. *Jenkins v. Weatherholtz*, 909 F.2d 105, 107 (4th Cir. 1990). The Fourth Circuit and this court have found previously that Virginia sheriffs, their departments, and their deputies, like other constitutional officers, are "arms of the State" for Eleventh Amendment purposes.[4] *Bland*, 730 F.3d at 390; *Smith v. McCarthy*, 349 F. App'x 851, 858 n.11 (4th Cir. 2009) (citing *Will*, 491 U.S. at 71); *Clay v. Campbell Cty. Sheriff's Office*, No. 6:12cv62, 2013 WL 3245153, at *4 (W.D. Va. June 26, 2013) (citing *Estate of Harvey v. Roanoke City Sheriff's Office*, No. 7:06cv603, 2007 WL 602091, at *3 (W.D. Va. Feb. 23, 2007)); *Blankenship v. Warren Cty.*, 918 F. Supp. 970, 973–74 (W.D. Va. 1996).

Cadmus suggests that Eleventh Amendment immunity does not apply here because any damages resulting from Nicholson's and Williamson's liability in their official capacities would

---

[4] Although Defendants do not expressly raise this as a defense, I note that by this same logic, these Defendants in their official capacities are not "persons" within the meaning of § 1983, and thus cannot be held liable for damages with regard to Cadmus's constitutional claims. *Will*, 491 U.S. at 71.

10

be payable through a private insurer, rather than from the state treasury. Pl. Resp. to Williamson's Mot. to Dismiss 2, ECF No. 35; Pl. Reply Br. 7–9, Nov. 2, 2015, ECF No. 45. Cadmus is correct to note that the source of funds that would pay a judgment is an important consideration in Eleventh Amendment analysis. *See Hess v. Port Auth. Trans-Hudson Corp.*, 513 U.S. 30, 48–49 (1994); *Bland*, 730 F.3d at 390 (citing *Cash v. Granville Cty. Bd. of Educ.*, 242 F.3d 219, 223 (4th Cir. 2001); *Blankenship*, 918 F. Supp. at 974 (citing *McCoy v. Chesapeake Corr. Ctr.*, 788 F. Supp. 890, 892 (E.D. Va. 1992)). He is incorrect, however, to claim that any damages awarded here would not be paid from the Virginia Treasury. Sheriffs, like other constitutional officers, are covered by a risk management plan that is funded by the Commonwealth. *See* Va. Code Ann. § 2.2-1839; *Brown v. Caldwell*, No. 7:13cv553, 2014 WL 4540332, at *6 (W.D. Va. Sept. 11, 2014); *Blankenship*, 918 F. Supp. at 974. Because any judgment against a sheriff and his deputies in their official capacities would be payable out of a trust funded by the state treasury, Eleventh Amendment immunity is appropriate in this case. *Brown*, 2014 WL 4540332, at *6. I therefore recommend that all claims against the FCSD and against Williamson, Nicholson, and any unnamed deputies in their official capacities be dismissed with prejudice.

2. *Judicial Immunity*

Cook, meanwhile, argues that she is protected from all monetary claims against her in both her official and individual capacities by the doctrine of judicial immunity. In order to allow judges to act freely upon their convictions, the common law has long recognized immunity for judges from suit for money damages. *Mireles v. Waco*, 502 U.S. 9, 9–10 (1991) (per curiam). Judicial immunity is an absolute immunity: it does not merely protect a defendant from assessment of damages, but also protects her from damages suits entirely. *Id.* at 11. Magistrates

11

are judicial officers and therefore are entitled to judicial immunity under the same conditions as judges. *King v. Myers*, 973 F.2d 354, 356 (4th Cir. 1992).

Judicial immunity, though broad, does not cover all acts taken by a judicial officer. Instead, two conditions must be met. First, the judicial officer cannot have acted "in the 'clear absence of all jurisdiction.'" *Id.* (quoting *Stump v. Sparkman*, 435 U.S. 349, 357 (1978)). This requirement concerns the judge's subject matter jurisdiction over the case before her. *Id.* at 357 (citing *Stump*, 435 U.S. at 356). The scope of jurisdiction is construed broadly, and immunity will only be unavailable if jurisdiction was clearly absent, not merely if the judge acted in excess of her jurisdiction. *Id.* at 356–57. Second, the alleged action must have been a "judicial act." *Id.* at 357. In order to be a judicial act, the action in question must be of a type normally performed by a judge, and it must have been performed while the parties dealt with the judge in her judicial capacity. *Id.* An act is still judicial, and immunity still applies, even if the judge commits "'grave procedural errors.'" *Id.* (quoting *Stump*, 435 U.S. at 359).

Here, it is necessary to consider each of Cook's actions separately. There can be no doubt that she is entitled to immunity for her actions in issuing the arrest warrants and setting Cadmus's bail. These actions fall explicitly within a magistrate's subject matter jurisdiction. *See* Va. Code Ann. § 19.2-45 (enumerating the powers of Virginia magistrates, including the authority to issue process of arrest and to admit a suspect to bail or to jail); *King*, 973 F.2d at 357 ("[T]he subject matter of alleged criminal conduct in the context of a domestic relations dispute is an area over which magistrates have jurisdiction."). They are also unquestionably judicial acts. It is not enough for Cadmus to allege that these actions were taken without probable cause or even with malicious intent. Judicial immunity is broad, protecting judicial officers from liability

12

for actions that are taken improperly or maliciously, so long as the magistrate has acted within her judicial role. *Stump*, 435 U.S. at 356–57.

A closer question is whether judicial immunity shields Cook from liability for allegedly collaborating with or coaching Nicholson while he filled out his criminal complaint, as Cadmus alludes to in his original Complaint and asserts with somewhat more detail in his Proposed Amended Complaint. Cadmus claims that Cook did not have authority to speak with Nicholson about the case *ex parte* prior to swearing him in for a probable cause hearing.[5] Pl. Resp. to Cook's Mot. to Dismiss 2–3, ECF No. 36. The Virginia Code requires that a person who is arrested without a warrant be brought before a magistrate for a probable cause hearing so that "the accused and the arresting officer may simultaneously see and speak to such magistrate." Va. Code Ann. § 19.2-82. Although Cook's actions, according to Cadmus, went outside of this requirement, such a procedural error will not, by itself, remove judicial immunity. *See King*, 973 F.2d at 357.

Perhaps more importantly, Cadmus seems to argue that, by assisting in the drafting of the criminal complaint, Cook stepped outside her judicial role and into the role of law enforcement. Pl. Resp. to Cook's Mot. to Dismiss 2–3. "[D]espite its breadth, the doctrine of absolute judicial immunity does not protect a judge performing the purely prosecutorial functions involved in initiating criminal prosecutions." *Barnes v. Winchell*, 105 F.3d 1111, 1118 (6th Cir. 1997). This exception is narrow, however, and "even if a judge encroaches upon prosecutorial functions, the broad shield of absolute judicial immunity is not automatically overcome." *Id.* at 1118–19. In *Barnes*, the Sixth Circuit noted that this exception mostly applies to cases in which the judge

---

[5] Cadmus also argues in support of his Motion for Leave to Amend his Complaint that Cook did not have jurisdiction over the matter until the moment Nicholson had been sworn. Pl. Reply Br. 12–15, Nov. 23, 2015, ECF No. 55. No authority supports this argument, and I find that it has no merit.

13

initiates criminal proceedings based on her own private interests, rather than cases that are properly pending before her. *Id.* The allegations in this case establish that Nicholson initiated the prosecution, bringing Cadmus to Cook, who was acting in her capacity as a magistrate, for the purpose of swearing out criminal charges that Nicholson had investigated.

Moreover, courts have considered acts that were similar to (or well beyond) what Cadmus alleges here and determined that these acts were judicial. *See Brookings v. Clunk*, 389 F.3d 614, 622 (6th Cir. 2004) (finding that judge who himself swore out a criminal complaint upon learning that the plaintiff had committed fraud in his court had engaged in a judicial act); *Barnes*, 105 F.3d at 1119–21 (finding that judge who directed complainants to change the charges in their criminal complaints and then assisted with drafting the complaints engaged in a judicial act); *King*, 973 F.2d at 358 (finding that magistrate engaged in a judicial act when she ordered the warrantless arrest of the accused); *Ashelman v. Pope*, 793 F.2d 1072, 1078 (9th Cir. 1986) (en banc) (finding judge immune from suit for allegedly conspiring with prosecutor to predetermine the outcome of a proceeding). Considering the rationales of these cases, I find that Cook performed a judicial act within the jurisdiction vested in her by the Virginia Code. I therefore find that Magistrate Cook is protected by absolute judicial immunity and recommend that all federal and state[6] claims against her in both her official and personal capacities be dismissed with prejudice.

### 3.    Failure to State a Claim

In addition to their immunity defenses, Defendants argue that Cadmus has failed to state a claim upon which relief can be granted, and, thus, his Complaint should be dismissed pursuant to Rule 12(b)(6). A complaint must "state[] a plausible claim for relief" that "permit[s] the court

---

[6] "The standards for judicial immunity under Virginia law are substantively the same as those under federal law." *Battle v. Whitehurst*, 831 F. Supp. 522, 529 n.7 (E.D. Va. 1993).

to infer more than the mere possibility of misconduct." *Ashcroft v. Iqbal,* 556 U.S. 662, 679 (2009). In making this determination, the Court accepts as true all well-pled facts and construes those facts in the light most favorable to the plaintiff. *Philips*, 572 F.3d at 180. The Court need not accept legal conclusions, formulaic recitation of the elements of a cause of action, or "bare assertions devoid of further factual enhancements," however, as those are not well-pled facts for Rule 12(b)(6)'s purposes. *Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc.*, 591 F.3d 250, 255 (4th Cir. 2009) (citing *Iqbal*, 556 U.S. at 678).

Plaintiffs must plead enough facts to "nudge[] their claims across the line from conceivable to plausible," and the Court should dismiss a complaint that is not "plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). Determining whether a complaint states a plausible claim for relief is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679. Federal courts have an obligation to construe *pro se* pleadings liberally, so that any potentially valid claim can be fairly decided on its merits rather than the *pro se* litigant's legal acumen. *Rankin v. Appalachian Power Co.*, No. 6:14cv47, 2015 WL 412850, at *1 (W.D. Va. Jan. 30, 2015) (citing *Boag v. MacDougall,* 454 U.S. 364, 365 (1982)). Still, "a *pro se* plaintiff must . . . allege facts that state a cause of action, and district courts are not required 'to conjure up questions never squarely presented to them.'" *Consider v. Medicare*, No. 3:09cv49, 2009 WL 9052195, at *1 (W.D. Va. Aug. 3, 2009) (quoting *Beaudett v. City of Hampton*, 775 F.2d 1274, 1278 (4th Cir. 1985)), *aff'd*, 373 F. App'x 341 (4th Cir. 2010).

### a. *False Arrest and Unreasonable Search and Seizure*

Cadmus has broadly asserted a claim of unreasonable search and seizure, in violation of the Fourth and Fourteenth Amendments, against Nicholson and two of the unnamed Defendants.

Compl. 21. Although he does not specify which particular actions provide a basis for this claim, his Complaint includes four events that potentially implicate Fourth Amendment concerns: 1) the deputies' investigation of the June 9, 2013, domestic incident and Cadmus's subsequent warrantless arrest, 2) Nicholson's August 2013 search of Cadmus's home, 3) the deputies' attempt to serve Cadmus with a summons at 3:00 a.m. for a parking ticket, and 4) Deputy John Doe's April 2015 attempt to serve Cadmus with another summons by entering the foyer of Cadmus's home over his objection. Cadmus also asserts a common law claim for false arrest against Nicholson.[7] *Id.*

### i. The June 9 Incident

The incident that most clearly falls within Cadmus's claim, and the one about which he has provided the most detail, is the investigation of domestic violence and Cadmus's subsequent arrest on assault and battery charges, which occurred on June 9, 2013 ("the June 9 incident"). Cadmus argues that Nicholson "searched and seized Cadmus without a warrant for alleged misdemeanors not committed in his presence." Compl. ¶ 41. The Supreme Court has not directly addressed whether the Fourth Amendment permits a warrantless arrest for a misdemeanor committed outside of the presence of the arresting officer. *Altwater v. Lago Vista*, 532 U.S. 318, 340 n.11 (2001) (declining to address this issue). The Fourth Circuit Court of Appeals has reached this issue and found that the Fourth Amendment does not require that an arrest for misdemeanors committed outside the presence of the arresting officer be made pursuant to a warrant. *Street v. Surdyka*, 492 F.2d 368, 372 (4th Cir. 1974); *see also Levine v. Rodden*, Civ. No. 15-574, 2015 U.S. Dist. LEXIS 60139, at *15 (E.D. Pa. May 7, 2015) (noting the "Fourth,

---

[7] To the extent Cadmus asserts his false arrest claim against Cook, *id.* ¶ 77, she is protected by absolute immunity. Furthermore, Cadmus's allegations against Cook are more akin to a claim for malicious prosecution, as discussed *infra*, than a claim for false arrest.

Fifth, Sixth, Seventh, and Ninth Circuits … have found that the Fourth Amendment does not impose an 'in the presence' requirement [for a misdemeanor arrest] in addition to the requirement for probable cause"). Instead, a warrantless arrest is permissible under the Fourth Amendment if the officer had probable cause to make the arrest. *See Street*, 492 F.3d at 371–72. Virginia law also authorizes an officer to make a warrantless arrest for assault and battery not committed in his presence if the arrest "is based on probable cause upon reasonable complaint of the person who observed the alleged offense," Va. Code Ann. § 19.2-81, and in a case of assault and battery against a family or household member, requires that the officer *must* arrest the suspect if he has probable cause to believe that suspect was the predominant physical aggressor, Va. Code § 19.2-81.3(B); *see also Pleasants v. Town of Louisa*, 847 F. Supp. 2d 864, 879 (W.D. Va. 2012)(citing Va. Code Ann. § 19.2-81.3(B))  ("Virginia law authorizes (and perhaps even requires) arrest without a warrant in cases of assault and battery against a family or household member in violation of Virginia Code § 18.2-57.2) , *rev'd on other grounds*, 524 F. App'x 891 (4th Cir. 2013). Thus, the relevant standard for both Cadmus's federal and state claims is probable cause.[8] *Lucas v. Shively*, 31 F. Supp. 3d 800, 811 (W.D. Va. 2014).

Probable cause to make an arrest exists when there are "facts and circumstances within the officer's knowledge that are sufficient to warrant a prudent person, or one of reasonable caution, in believing, in the circumstances shown, that the suspect has committed, is committing, or is about to commit an offense." *Michigan v. DeFillippo*, 443 U.S. 31, 37 (1979). The inquiry into probable cause is based on common sense rather than technical requirements, *Illinois v. Gates*, 462 U.S. 213, 231 (1983), and takes into consideration the totality of the circumstances

---

[8] Because Cadmus's federal and state claims share the common element of probable cause and are essentially the same in all other respects,  I analyze them jointly. *See Grasty v. City of Roanoke*, No. 7:09cv471, 2010 WL 3219991, at *2 & n.2 (W.D. Va. Aug. 13, 2010)

known to the officer at the time of the arrest, *Brown v. Gilmore*, 278 F.3d 362, 367 (4th Cir. 2002). Probable cause does not require evidence sufficient to convict, *id.* (citing *Wong Sun v. United States*, 371 U.S. 471, 479 (1963)), and the officer need not have known with certainty that the accused committed the offense, *Smith v. McCluskey*, 126 F. App'x 89, 93 (4th Cir. 2005). It does, however, require more than mere suspicion. *Porterfield v. Lott*, 156 F.3d 563, 569 (4th Cir. 1998).

Cadmus alleges in his original Complaint that Nicholson and the other deputies lacked probable cause to arrest him because of the flawed manner in which they conducted their investigation. He claims that the officers immediately took the side of Carver and Sirbaugh, allowed Carver and Sirbaugh to corroborate each other's statements, which Cadmus says implicated him in assaulting Carver and Sirbaugh; disregarded Cadmus's version of events; and refused to credit Cadmus's claims that Carver was not trustworthy because of her criminal history and drug use. These allegations, however, do not support a finding that Nicholson lacked probable cause to arrest Cadmus. Although Cadmus vaguely accuses Carver and Sirbaugh of lying to the deputies, he does not give any reason why a reasonable officer could not believe their account of the incident over his. Cadmus does not even dispute that some form of physical altercation took place, and he acknowledges in his Complaint that Carver showed visible signs of injury. These facts are not inconsistent with Cadmus's account of the incident, but they could also be seen as corroborating a version of events in which Cadmus was the primary aggressor. An officer is not required to credit the suspect's story over that of the alleged victim, and when the victim's story is corroborated by evidence of injury or otherwise reasonably trustworthy, probable cause for arrest exists. *See Ricciuti v. N.Y.C. Transit Auth.*, 124 F.3d 123, 128 (2d Cir. 1997).

In addition, the deputies were not required to look into Carver's arrest record or drug history, despite Cadmus's urging that they do so. Developing probable cause does not require an officer to "exhaust every potentially exculpatory lead or resolve every doubt about a suspect's guilt." *Torchinsky v. Siwinski*, 942 F.2d 257, 264 (4th Cir. 1991). Furthermore, even though Cadmus claims that the deputies went into the investigation with a preexisting bias against him, this does not affect the probable cause analysis. The reasonableness of a seizure is measured in objective terms, *S.P. v. City of Takoma Park*, 134 F.3d 260, 273 (4th Cir. 1998) (citing *Ohio v. Robinette*, 519 U.S. 33, 38 (1996)); thus, the probable cause inquiry must be based on the totality of facts known to the officers at the time of the arrest, and not their subjective intentions or biases. Crediting Cadmus's well-pled allegations and the inferences drawn therefrom, I find that his allegations themselves show that his arrest was supported by probable cause, notwithstanding his assertion that the information he provided to police was more credible. Therefore Cadmus's Fourth Amendment and common law claims for false arrest must fail. *See Street*, 492 F.2d at 371–72 ("[T]here is no cause of action for 'false arrest' under section 1983 unless the arresting officer lacked probable cause."); *accord Pleasants*, 847 F. Supp. 2d at 879.

Cadmus also makes other miscellaneous allegations with regard to the investigation and his arrest, but to the extent that these can be read as claims of Fourth or Fourteenth Amendment violations, they must also fail. For example, Cadmus alleges that Nicholson used "unlawful, unreasonable, and unnecessary force" by placing him in handcuffs that were too tight and ignoring his requests to adjust them. Compl. ¶¶ 55–56. He has not alleged any actual injury resulting from this, however, and such a de minimis allegation cannot as a matter of law support an excessive force claim. *See Carter v. Morris*, 164 F.3d 215, 219 n.3 (4th Cir. 1999). In addition, Cadmus states in a conclusory manner that Nicholson "searched and seized" him when

19

he placed him under arrest. Compl. ¶ 56. There is nothing in the original Complaint that indicates whether any kind of a search took place or whether Cadmus is using boilerplate language to allege a Fourth Amendment violation. To the extent Cadmus has alleged a search of his person contemporaneous with the arrest, such a search is permissible under the Fourth Amendment. *United States v. Robinson*, 414 U.S. 218, 235 (1973).

### ii.    *Subsequent Police Visits*

Cadmus's Fourth Amendment claims may also relate to the subsequent police visits he describes in his Complaint. The first of these, in which Cadmus alleges that he arrived home and found Nicholson in his house "investigating something unrelated to Mr. Cadmus," Compl. ¶ 72, and the third, in which Cadmus alleges that an unnamed deputy walked into Cadmus's home to serve him a parking ticket summons and then refused to leave when Cadmus objected, *id.* ¶ 74, could possibly give rise to a claim, *see Covey v. Assessor of Ohio Cty.*, 777 F.3d 186, 195 (4th Cir. 2015) (finding that tax assessor's entry into private residence to leave a pamphlet could violate the Fourth Amendment), but in their current form are described in too little detail to state a plausible claim for relief. As discussed *infra*, the Court will allow Cadmus to submit an amended complaint on some of his claims, including for these two incidents.

The second incident he describes, in which deputies knocked on Cadmus's door at 3:00 a.m. in order to serve him with a summons, *id.* ¶ 73, not only fails to include a sufficient amount of detail for the Court to make a meaningful evaluation, but also does not describe an action that implicates the Fourth Amendment at all. "[A] police officer not armed with a warrant may approach a home and knock, precisely because that is 'no more than any private citizen might do.'" *Florida v. Jardines*, 133 S. Ct. 1409, 1416 (2013). Furthermore, Cadmus does not allege that the deputies approached his door for the purpose of a search or seizure. There is no

indication that the officers sought to gather information, as is inherent to a "search," *cf. id.* at 1414, and the issuance of a citation does not amount to a "seizure," *Artes-Roy v. City of Aspen*, 31 F.3d 958, 962 (10th Cir. 1994). For these reasons, I recommend that Cadmus's Fourth Amendment claims be dismissed without prejudice.

<em>b.     Malicious Prosecution</em>

Cadmus asserts claims for malicious prosecution in two separate counts of the Complaint. In Count I, he asserts a claim under an unspecified cause of action, and in Count VII he asserts a claim under Virginia common law. A liberal reading of Cadmus's Complaint suggests that his Count I claim for malicious prosecution is intended as a federal claim under § 1983. Technically, there is no § 1983 cause of action for "malicious prosecution"; instead, courts have interpreted these claims as being based on a violation of the claimant's Fourth Amendment right against unreasonable seizure. *Lambert v. Williams*, 223 F.3d 257, 261–62 (4th Cir. 2000). The § 1983 claim does, however, incorporate elements of the common law tort of malicious prosecution, *id.* at 262, and so I will consider these two claims jointly.

In order to state a common law claim for malicious prosecution in Virginia, the claimant must allege facts establishing "that the prosecution was (1) malicious, (2) instituted by or with the cooperation of the defendant, (3) without probable cause, and (4) terminated in a manner not unfavorable to the plaintiff." *Reilly v. Shepherd*, 643 S.E.2d 216, 218 (Va. 2007); *see Lambert*, 223 F.3d at 260 (reciting similar elements). The elements for a § 1983 malicious prosecution claim are the same except for the malice requirement, which is irrelevant when evaluating a Fourth Amendment claim. *Snider v. Seung Lee*, 584 F.3d 193, 202 (4th Cir. 2009) (Stamp, J., concurring); *see Lambert*, 223 F.3d at 262 n.2 ("[M]alice [is] not an element of the § 1983 claim since the reasonableness of a seizure under Fourth Amendment jurisprudence 'should be

21

analyzed from an objective perspective.'" (quoting *Brooks v. City of Winston-Salem*, 85 F.3d 178, 184 n.5 (4th Cir. 1996))). There is no dispute that the Defendants named in these claims, Nicholson and Cook, took part in initiating criminal proceedings against Cadmus, or that the charges resulted in a favorable disposition for Cadmus. As to Magistrate Cook, the claim must fail because she has judicial immunity. As to Nicholson, Cadmus has not alleged sufficient facts to establish lack of probable cause.

In the context of malicious prosecution, "[m]alice may be inferred from a lack of probable cause, but a lack of probable cause may not be inferred from malice." *Reilly*, 643 S.E.2d at 219 (citing *Bill Edwards Oldsmobile, Inc. v. Carey*, 244 S.E.2d 767, 773 (Va. 1978)). Thus, it is unnecessary to address the malice requirement if the objective circumstances give rise to a finding of probable cause. The probable cause analysis for this claim, however, is distinct from the analysis for Cadmus's false arrest claim. I must consider the facts known to the Defendants at the time the complained-of actions—here, the filing of the criminal complaint and issuance of arrest warrants—were made; those facts may change between the time of the arrest and the time charges were filed. *See Sennett v. United States*, 778 F. Supp. 2d 655, 666–67 (E.D. Va. 2011). In this case, there is no material difference between the facts that established probable cause to arrest and those that established probable cause to prosecute. The only new information that Nicholson learned after the arrest—that Cadmus's fingernails were too short to have caused the scratches on Carver's arm—does not diminish the likelihood that Carver sustained her injury during a physical altercation with Cadmus. After all, Cadmus alleges that Carver told the officers that Cadmus assaulted her, and she showed them the scratch, but he does not allege that she said she received the scratch from Cadmus's fingernails. Moreover, Carver's general report of an assault was not limited to a specific touching, such as a scratch from Cadmus's fingernails. I

therefore find that there was probable cause to issue the arrest warrant and recommend that Cadmus's state and federal malicious prosecution claims be dismissed.

### c.    Conspiracy

In Count III, Cadmus alleges that the officers conspired to violate his civil rights in the June 9 incident. A claim of conspiracy to deprive civil rights may be brought under 42 U.S.C. §§ 1983 and 1985(3). Although Cadmus cites to § 1985 in his Complaint, Compl. ¶ 1, this action does not fall within the scope of that statute. Cadmus has never alleged that he is a member of a suspect or protected class,[9] a necessary element in a § 1985 claim. *See C & H Co. v. Richardson*, 78 F. App'x 894, 901–02 (4th Cir. 2003) (rejecting a § 1985 claim premised on discrimination against a "class of one"); *Buschi v. Kirven*, 775 F.2d 1240, 1257–58 (4th Cir. 1985) (observing that a § 1985 claim must allege a conspiracy based on "class-based discriminatory animus" and opining that the classes protected by that statute are the types that have suffered historical discrimination, such as racial minorities). Cadmus has thus failed to raise a claim under § 1985.

In order to properly state a claim for conspiracy under § 1983, Cadmus must plead facts that establish "'that the [defendants] acted jointly in concert and that some overt act was done in furtherance of the conspiracy which resulted in [the plaintiff's] deprivation of a constitutional right.'" *Martin v. Byers*, 581 F. App'x 225, 226 (4th Cir. 2014) (per curiam) (quoting *Hinkle v. City of Clarksburg*, 81 F.3d 416, 421 (4th Cir. 1996)). I find that Cadmus's conspiracy claim fails for multiple reasons. First, he has not adequately alleged a deprivation of his constitutional rights, as noted in other sections of this analysis. In addition, I find that this claim fails because Cadmus does not allege, other than by bare conclusory assertion, that there was any agreement or

---

[9] As discussed *infra*, Cadmus does not allege he is a member of a protected class, but instead appears to allege in his equal protection claim that he comprises a "class of one."

meeting of the minds among the Defendants to deprive him of his rights. Instead, he simply states that the (unspecified) Defendants

> all agreed to not be objective and immediately foresaw and treated Mr. Cadmus as the suspect prior to arrival; and not a victim or citizen in distress in violation of his rights, and then covered up the unreasonable search and seizure, after the fact by administrative complaint and greivance [sic] process; and continued prosecuting Mr. Cadmus in violation of his rights.

Compl. ¶ 84. Although the necessary meeting of the minds may be shown circumstantially, Cadmus cannot rely on "rank speculation and conjecture." *Hinkle*, 81 F.3d at 421–22. At most, the facts alleged in the Complaint might give rise to an inference that the Defendants had preformed their opinions of Cadmus prior to the events at issue, but this falls short of an actual conspiracy. For these reasons, I recommend that Cadmus's claim of conspiracy be dismissed.

### d. Equal Protection

Count V asserts a claim for violation of the Equal Protection Clause of the Fourteenth Amendment, stating that the Defendants "discriminated against Mr. Cadmus on the basis of Free Speech."[10] Compl. ¶ 91. This may be best understood as an equal protection claim brought by Cadmus as a "class of one." *See Vill. of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000) (per curiam). Such a claim lies "where the plaintiff alleges that [he] has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment." *Id.* In addition, the unequal treatment must have been "'the result of intentional or purposeful discrimination.'" *Sandlands C & D LLC v. Cty. of Horry*, 737 F.3d 45, 55 (4th Cir. 2013) (quoting *Morrison v. Garraghty*, 239 F.3d 648, 654 (4th Cir. 2001)).

---

[10] Although this phrasing could possibly indicate that Cadmus sought to raise a claim for retaliation in violation of the First Amendment, he does not expressly do so in the original Complaint. Cadmus asserts a retaliation claim in his Proposed Amended Complaint, which is addressed *infra*.

Cadmus has not specified which of the events included in his Complaint were discriminatory. For most of the actions described in the Complaint, Cadmus has simply failed to allege the existence of other, similarly situated individuals who were treated differently from him. Under a broad reading of the Complaint, Cadmus has arguably identified one instance in which he was treated differently from a similarly situated individual—the law enforcement response to the June 9 incident, which was initiated when he and Sirbaugh each called 911 to report the other, but which ended with Cadmus under arrest as the only suspect. Based on the facts alleged in the Complaint, Cadmus has not shown that the reasons for the disparity in treatment were arbitrary or irrational. *See Tri Cty. Paving, Inc. v. Ashe Cty.*, 281 F.3d 430, 440 (4th Cir. 2002). As explained *supra*, the officers who responded to the 911 calls had probable cause to arrest Cadmus and therefore had a rational basis for doing so. *See Avila v. Pappas*, 591 F.3d 552, 554 (7th Cir. 2010) ("Probable cause is a rational basis for official action."). Accordingly, this claim must be dismissed.

### e.  *Supervisory Liability*

Count IV asserts a claim for supervisory liability against Williamson and John Does. For a number of reasons, this claim must fail. As an initial matter, Cadmus has failed to establish a predicate constitutional violation. Supervisory liability under § 1983 is derivative in nature and therefore requires an underlying constitutional injury. *Evans v. Chalmers*, 703 F.3d 636, 654 (4th Cir. 2012). For the reasons explained *supra*, I do not find that Cadmus has stated a constitutional claim based on any of the actions taken by Nicholson or other unnamed deputies, leaving him without any basis to assert supervisory liability.

Furthermore, Cadmus has not alleged any personal involvement by Williamson that would give rise to a claim for supervisory liability. In a § 1983 action, supervisory officials may

not be held vicariously liable for the conduct of their subordinates under a theory of *respondeat superior*. *Iqbal*, 556 U.S. at 676. Instead, the supervisor himself must have acted in a way that makes him in part responsible for the alleged constitutional violation. *Id.*; *accord Danser v. Stansberry*, 772 F.3d 340, 349 (4th Cir. 2014). The supervisor's responsibility for his subordinates' violations is premised upon "a recognition that supervisory indifference or tacit authorization of subordinates' misconduct may be a causative factor in the constitutional injuries they inflict on those committed to their care." *Slakan v. Porter*, 737 F.2d 368, 373 (4th Cir. 1984) (citing *Orpiano v. Johnson*, 632 F.2d 1096, 1101 (4th Cir. 1980)). A claim for supervisory liability thus requires the showing of three elements:

> (1) that the supervisor had actual or constructive knowledge that his subordinate was engaged in conduct that posed a pervasive and unreasonable risk of constitutional injury to citizens like the plaintiff; (2) that the supervisor's response to that knowledge was so inadequate as to show deliberate indifference to or tacit authorization of the alleged offensive practices; and (3) that there was an affirmative causal link between the supervisor's inaction and the particular constitutional injury suffered by the plaintiff.

*Shaw v. Stroud*, 13 F.3d 791, 799 (4th Cir. 1994) (citations and internal quotation marks omitted).

The first element is established only if the plaintiff can show that the supervisor had knowledge of conduct by a subordinate that presents "a pervasive and unreasonable risk of constitutional injury to the plaintiff." *Id.* Cadmus does not identify any conduct, prior to the June 9 incident, that would have put Williamson on notice that Cadmus was at risk of being subjected to arbitrary arrest, unreasonable search, or any of the other injuries he complains of here. In turn, Cadmus's complaints regarding that incident would not have put Williamson on notice of any potential for abuse because Williamson's subordinates determined that the complaints were unfounded—a determination with which the Court agrees. Subsequent to this, Cadmus has not

Case 5:15-cv-00045-MFU-JCH   Document 56   Filed 02/01/16   Page 26 of 58   Pageid#: 1629

alleged that he did anything to bring other potentially wrongful conduct to Williamson's attention.

In addition, Cadmus has failed to plead facts showing that Williamson was deliberately indifferent, which must be established by "demonstrating a supervisor's 'continued inaction in the face of documented widespread abuses.'" *Id.* (quoting *Slakan*, 737 F.2d at 373). Here, there are no allegations of abuses other than those that provide the basis for Cadmus's Complaint—the June 9 incident and three subsequent visits by deputies to Cadmus's home over the next two years. Williamson had no obligation to act in the face of Cadmus's complaints regarding the June 9 incident because these complaints failed to establish an actual violation of Cadmus's rights. Furthermore, these isolated incidents do not rise to the level of "widespread abuses" necessary to trigger supervisory liability. *Id.* "[I]n establishing 'deliberate indifference' under *Shaw's* second prong, a plaintiff '[o]rdinarily . . . cannot satisfy his burden of proof by pointing to a single incident or isolated incidents . . . for a supervisor cannot be expected . . . to guard against the deliberate criminal acts of his properly trained employees when he has no basis upon which to anticipate the misconduct.'" *Moore v. Greenwood Sch. Dist. No. 52*, 195 F. App'x 140, 144 (4th Cir. 2006) (per curiam) (alterations in original) (quoting *Randall v. Prince George's Cty.*, 302 F.3d 188, 206 (4th Cir. 2002)). The challenged conduct has not occurred with the amount of regularity that would suggest a need for preventative action by Williamson.

Finally, Cadmus has not shown a causal link between Williamson's inaction and his alleged injuries. This is particularly true with regard to the June 9 incident. Williamson cannot be held responsible for the actions of his deputies on that date simply by virtue of failing to investigate the circumstances of the arrest or punish his subordinates for their conduct after the fact. *See Danser*, 772 F.3d at 349–50; *Jackson v. Brickey*, 771 F. Supp. 2d 593, 603 (W.D. Va.

27

2011); *Wilson v. Kittoe*, 229 F. Supp. 2d 520, 538 (W.D. Va. 2002). Cadmus's arguments to this effect misstate the nature of supervisory liability and do not give rise to a claim. For these reasons, I recommend that Cadmus's claim for supervisory liability be dismissed.

<blockquote>f.  *Intentional Infliction of Emotional Distress*</blockquote>

The final claim Cadmus asserts is for intentional infliction of emotional distress, a common law tort that is "not favored" by the Virginia courts. *SuperValu, Inc. v. Johnson*, 666 S.E.2d 335, 343 (Va. 2008). In order to state a claim for intentional infliction of emotional distress, the plaintiff must establish that "(1) the wrongdoer's conduct was intentional or reckless; (2) the conduct was outrageous or intolerable; (3) there was a causal connection between the wrongdoer's conduct and the resulting emotional distress; and (4) the resulting emotional distress was severe." *Id.* (citations omitted).

As with his other claims, Cadmus does not identify the particular conduct that is included within his claim or the Defendant against whom it is made. Even reading this claim so broadly as to encompass every allegation within the Complaint, I do not find any instance of conduct that is so outrageous or intolerable as to give rise to a claim for intentional infliction of emotional distress.[11] In order to satisfy this element of the claim, Cadmus must allege conduct that is "'so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.'" *Russo v. White*, 400 S.E.2d 160, 162 (Va. 1991) (quoting Restatement (Second) of Torts § 46 cmt. d (1965)). Only the most egregious actions are sufficient to give rise to liability. *Compare Delk v. Columbia/HCA Healthcare Corp.*, 523 S.E.2d 826, 833 (Va. 2000) (observing that defendants' knowing failure to inform plaintiff that she had been exposed to HIV could be

---

[11] To the extent Williamson is included as a Defendant on this claim, dismissal is clearly appropriate because Cadmus has not alleged *any* conduct by him.

sufficiently outrageous), *and Womack v. Eldridge*, 210 S.E.2d 145, 148 (Va. 1974) (stating that a reasonable jury could find that defendant acted outrageously when she used false pretenses to obtain a picture of plaintiff for use as evidence in a third party's trial on child molestation charges), *with Harris v. Kreutzer*, 624 S.E.2d 24, 33–34 (Va. 2006) (finding that plaintiff had failed to allege sufficiently outrageous conduct by a doctor who, while examining her for traumatic brain injury, "verbally abused [her], caused her to break down into tears . . ., stated she was 'putting on a show,' and accused her of being a faker and malingerer" (alterations in original)).

As to the June 9 incident, nothing in the Complaint (aside from Cadmus's bare allegation of a conspiracy) suggests that the Defendants did not act in good faith. As noted *supra*, the arrest and charges against Cadmus were supported by probable cause. They should not be considered outrageous or intolerable simply because Cadmus was not ultimately convicted. *See Hammond v. Morley*, No. 3:11cv53, 2011 WL 2681231, at *4 (E.D. Va. July 8, 2011) ("Plaintiff's allegations—that he was assaulted by officers who used excessive force against him and wrongfully arrested him—do not constitute the type of outrageous and extreme behavior required to support a claim for intentional infliction of emotional distress under Virginia law."). Furthermore, Cadmus's allegations that Cook, Nicholson, and the unnamed deputies acted rudely towards him do not support his claim. *See Harris*, 624 S.E.2d at 34 ("Insensitive and demeaning conduct does not equate to outrageous behavior.").

Likewise, Cadmus has not stated a claim for intentional infliction of emotional distress regarding the subsequent visits by deputies to his home. In each instance, Cadmus's allegations are insufficient to show that the deputies' actions were outrageous or intolerable. As to the first of these visits in August 2013, Cadmus asserts that he experienced feelings of extreme fear and

29

turmoil because Nicholson was present in his home to conduct an investigation of something unrelated to Cadmus. Compl. ¶ 72. The simple fact of Nicholson's presence, however, falls well short of outrageous or intolerable conduct, notwithstanding Cadmus's subjective feelings of distress. *See Hughes v. Moore*, 197 S.E.2d 214, 219 (Va. 1973) ("Absent specific knowledge by a defendant of a plaintiff's unusual sensitivity, there should be no recovery for mental or emotional disturbance and consequent physical injury to a hypersensitive person where a normal individual would not be affected under the circumstances."). Similarly, the other incidents Cadmus alleges—one in which deputies knocked on his door at 3:00 a.m., and another in which a deputy entered into his foyer, both for the purpose of serving summons for parking tickets— also fall short of conduct that would be considered so outrageous as to give rise to a claim for intentional infliction of emotional distress.

Furthermore, Cadmus has not alleged that he suffered sufficiently severe emotional distress as a result of the Defendants' actions. "[L]iability arises only when the emotional distress is extreme, and only where the distress inflicted is so severe that no reasonable person could be expected to endure it." *Russo*, 400 S.E.2d at 163. Cadmus simply alleges that he sustained "emotional trauma and suffering, requiring the expenditure of money for treatment." Compl. ¶ 75. Not only is this too conclusory to be considered a well-pled statement of fact, but it also fails to invoke the heightened level of severity necessary to state a claim for intentional infliction of emotional distress. *Cf. Harris*, 624 S.E.2d at 34 (finding that the plaintiff's symptoms, including "nightmares, difficulty sleeping, extreme loss of self-esteem and depression, requiring additional psychological treatment and counseling," were not sufficiently severe). For these reasons, I recommend that Cadmus's claim for intentional infliction of emotional distress be dismissed.

A.     *Cadmus's Proposed Amended Complaint*

After Williamson, Cook, and Nicholson each moved to dismiss Cadmus's Complaint, Cadmus moved for leave to amend his Complaint under Rule 15(a)(2). Attached to his Motion to Amend is a Proposed Amended Complaint with exhibits, *see generally* ECF Nos. 29-1, 33, and affidavits signed by Cadmus, Carver, and Judy Speet, a neighbor of Cadmus and Fabrizio, *see generally* ECF No. 29-2. The Proposed Amended Complaint, along with the exhibits and affidavits,[12] adds a number of new Defendants, factual allegations, and claims.

1.     *New Defendants*

Cadmus's Proposed Amended Complaint modifies the parties to this action. It adds as new Defendants John Heflin, Barry Kittoe, and Rick Singhas. Proposed Am. Compl. ¶¶ 9–10 & n.2. Each of these new proposed Defendants worked in a supervisory capacity at the FCSD. *Id.* Cadmus alleges that Heflin supervised Singhas, who in turn supervised Kittoe, who in turn supervised Nicholson. *Id.* Kittoe and Singhas are named in their individual capacities only, while it is unclear if Heflin is named only individually or is also named in his official capacity. *Id.* The Proposed Amended Complaint also names Nicholson and Cook only in their individual capacities, *id.* ¶¶ 11–12, although Williamson and the remaining John and Jane Does are still sued in both their individual and official capacities, *id.* ¶¶ 8, 13. The FCSD is still named in the Proposed Amended Complaint, *id.* ¶ 17, although Cadmus later conceded that it should not be named as a Defendant, Pl. Reply Br. 7.

---

[12] At this stage of the litigation, courts can consider documents attached to the complaint as exhibits, without converting the motion to one for summary judgment, to the extent those documents are incorporated by reference or otherwise integral to the complaint. *Occupy Columbia v. Haley*, 738 F.3d 107, 116–17 (4th Cir. 2013). Cadmus repeatedly refers to and relies on the attached exhibits and affidavits throughout his Proposed Amended Complaint and in his subsequent briefs.

2.    *New Factual Allegations*

As proof of Cadmus's activism, which he claims is the primary motive behind the alleged violations committed by the Defendants, the Proposed Amended Complaint includes additional background details describing Cadmus's long-running, frequently adversarial relationship with law enforcement and the courts. In general, however, these details do not provide much in the way of helpful context. Many of the examples Cadmus includes are vaguely or confusingly described. Most of the incidents cited do not involve Frederick County or its officials, making it difficult to discern a connection between those incidents and any possible retaliation by the Defendants. *See, e.g.*, Proposed Am. Compl. ¶¶ 22, 27–28, 31. Cadmus also describes disputes between himself and Frederick County law enforcement, but the examples of activism he cites in this context either took place after most of the events at issue in this case, *see id.* ¶ 22, ex. 18 (describing a dispute between Cadmus and Williamson over a FOIA request filed in December 2013 and involving alleged thefts from Fabrizio), or are already encompassed by his claims, *see id.* ¶ 26, ex. 16-22 (describing the complaints Cadmus filed with FCSD with regard to the June 9 incident).

Cadmus's Proposed Amended Complaint also contains more information regarding the June 9 incident. Some of these newly alleged facts work to supplement his original Complaint, while others contradict his prior allegations. The Proposed Amended Complaint provides a somewhat more detailed account of the physical altercation between Cadmus and Sirbaugh, stating that Sirbaugh grabbed Cadmus from behind while Cadmus attempted to walk out the back door to check on his mother, and the two wrestled and ended up against a wall. *Id.* ¶¶ 49–50. Cadmus then claims he was able to get free from Sirbaugh and again headed to the back door, but as he made his way outside, Sirbaugh and Carver also tried to walk through the back door.

32

*Id.* ¶¶ 51–52. Cadmus alleges that the force of all three people simultaneously going through the door caused the door to fly open and possibly[13] strike Fabrizio on the knee or the toe. *Id.* ¶ 52. This allegedly also caused the scratches on Carver's arm. *Id.* ¶ 81.

Cadmus now alleges that after the deputies arrived, he, Sirbaugh, and Carver all stood in front of the house, and when the deputies began walking into the house, Cadmus objected and told them he did not consent to their entry. *Id.* ¶¶ 61–66. He claims that once the deputies were inside, they "arrested" him in the living room chair while they spoke to Sirbaugh, Carver, and Fabrizio in the kitchen. *Id.* ¶ 66–67. Cadmus also alleges additional details with regard to the issuance of the arrest warrants against him. As explained in greater detail *infra*, it appears from the Proposed Amended Complaint that Cadmus now alleges that Nicholson wholly fabricated Cadmus's assault and battery of Carver and Fabrizio, rather than simply crediting Carver's and Sirbaugh's accounts of the incident over Cadmus's. In addition, Cadmus now claims that he observed Cook instructing Nicholson how to word the criminal complaint, *id.* ¶ 127, although he only specifically claims that he heard somebody say the words "pushed/assaulted," "walked through," and "striking . . . the door," and saw Cook affirmatively nod her head, *id.* ¶¶ 129–30.

The Proposed Amended Complaint also alleges new facts regarding the actions that took place after the June 9 incident, along with descriptions of some incidents that were not mentioned at all in the original Complaint. Cadmus has modified his claim regarding his unsuccessful complaint to the FCSD about Nicholson to include the new Defendants Heflin and Kittoe, who met with Cadmus in their capacities as supervisors within the Department. *Id.* ¶¶ 9–10, 164. He also alleges a new incident that occurred on August 17, 2013. Cadmus claims that he was alerted by a neighbor that Fabrizio was in poor condition and was possibly being neglected.

---

[13] Cadmus does not state as fact that Fabrizio was actually struck. *Id.* ¶ 52 & n.9.

*Id.* ¶¶ 178–79. Although Fabrizio's protective order against Cadmus was still in place, *id.* ¶ 178, he called the FCSD for a welfare check, *id.* ¶ 180. EMS and Defendant Does stayed for a short time, and then left after telling Cadmus that Fabrizio was fine. *Id.* ¶¶ 181–83. Two days later, Fabrizio was found on her kitchen floor partially clothed, without her oxygen, and incoherent. *Id.* ¶¶ 184–85. Fabrizio was taken to the hospital, but died on August 22, 2013. *Id.* ¶ 186.

Cadmus further elaborates in the Proposed Amended Complaint as to the warrantless search of his house that occurred in August 2013. He claims that when he arrived at his home, Nicholson, Kittoe, and at least three other unnamed deputies had been inside the home for approximately twenty minutes. *Id.* ¶¶ 196–99. Cadmus asked the deputies for a warrant, and one of the deputies told Cadmus that a warrant was unnecessary, then "pressured" him into signing a written consent to search. *Id.* ¶ 200. The deputies explained to Cadmus that they believed a dead body was in the house. *Id.* After several more minutes of searching, the deputies learned that the person they were searching for was still alive and left. *Id.* Finally, Cadmus describes an encounter with Nicholson, which he characterizes as an assault. He alleges that he was waiting at the NRADC magistrate window to speak about an unrelated issue. *Id.* ¶ 226. While he stood there, Cadmus saw Nicholson approach him while staring at him. *Id.* ¶ 227. Cadmus alleges that Nicholson purposefully attempted to walk into him, even though Nicholson had room to walk around him, and that this encounter put him in fear of a battery. *Id.* ¶¶ 227, 230–31.

    *3.*    *New Claims*

The Proposed Amended Complaint lists nine counts against the Defendants. As with the original Complaint, it is often difficult to determine what conduct and which parties are included in each count. Count I asserts a claim for deprivation of constitutional rights, pursuant to 42 U.S.C. § 1983. *Id.* at 34. Specifically, it claims that Cadmus's Fourth and Fourteenth

34

Amendment rights against unreasonable search and seizure were violated during the June 9 incident when officers entered his home over his protests, carried out what he characterizes as a flawed investigation, and arrested him. *Id.* ¶¶ 255–87. This Count is asserted against Nicholson and John Does.[14] *Id.* at 34. Count II asserts a claim for municipal liability under § 1983 and the Fourth Amendment, alleging deliberate indifference, failure to train, and warrantless entries. *Id.* at 39. It names Nicholson and John Does as Defendants, *id.*, although only Williamson, Heflin, Singhas, and FCSD are mentioned in the body of the Count, *id.* ¶¶ 294, 298, 300. Count III (numbered IV in the Proposed Amended Complaint) asserts a claim for conspiracy to unlawfully arrest and unlawful arrest, pursuant to § 1983 and the Fourth Amendment, against Nicholson and Cook. *Id.* at 42.

Count IV asserts a claim against Williamson, Heflin, Singhas, Kittoe, and John Does of failure to intercede, citing § 1983. *Id.* at 43. Cadmus claims the Defendants are liable under this Count for failing to prevent the entries onto Cadmus's property and into his home. *Id.* ¶ 312. Count V is labeled "(Equal Protection Violations) Conspiracy" and cites § 1983 and the Fourteenth Amendment. *Id.* at 43. It names as Defendants Williamson, Nicholson, Heflin, Singhas, Kittoe, and Cook.[15] *Id.* Count VI (numbered II in the Proposed Amended Complaint) asserts a claim for retaliation on the basis of protected speech against the FCSD, Williamson, Nicholson, Cook, and John Does. *Id.* ¶¶ 321–23. This Count appears to allege that the Defendants committed the alleged violations at issue here as a result of Cadmus's activism, defense of himself in prior court cases, and complaints to the FCSD about the actions of deputies. *Id.* ¶ 325. Cadmus claims that the Defendants directly and proximately caused his

---

[14] Kittoe is also mentioned by name in this Count, although it is unclear what his alleged involvement in this incident was or whether he is intended to be a Defendant. *Id.* ¶¶ 263, 271–72.

[15] Cadmus also names John Does in the body of this Count. *Id.* ¶ 315.

mother's death by removing him from her home and placing a protective order against him and by failing to take more action when Cadmus called for a welfare check. *Id.* ¶¶ 326–28.

Count VII asserts a claim of malicious prosecution against Nicholson and Cook for their involvement in the issuance of arrest warrants against Cadmus for the June 9 incident. *Id.* at 46. Count VIII (unnumbered in the Proposed Amended Complaint) asserts a claim for abuse of process under Virginia law, *id.*, which Cadmus voluntarily dismissed at oral argument. Count IX (numbered VI in the Proposed Amended Complaint) asserts a claim for intentional infliction of emotional distress. *Id.* at 47. It does not name any specific Defendants or conduct; instead, it reiterates, in summary fashion, his previous allegations. *Id.*

B.    *Motion for Leave to Amend Complaint*

Under the Federal Rules of Civil Procedure, a party may seek leave from the court to amend its pleading, and the court should grant leave to amend "when justice so requires." Fed. R. Civ. P. 15(a)(2). "Despite this general rule liberally allowing amendments," courts may deny leave to amend "if the amendment 'would be prejudicial to the opposing party, there has been bad faith on the part of the moving party, or the amendment would have been futile.'" *United States ex rel. Nathan v. Takeda Pharm. N. Am., Inc.*, 707 F.3d 451, 461 (4th Cir. 2013) (quoting *Laber v. Harvey*, 438 F.3d 404, 426 (4th Cir. 2006) (en banc)). Defendants argue that Cadmus should not be granted leave to amend because he has acted in bad faith by changing key facts in his Proposed Amended Complaint to contradict facts stated in his original Complaint and because, in any case, he cannot state a claim based on the alleged facts, and so amendment would be futile.

*1.    Bad Faith*

Defendants contend that Cadmus acted in bad faith by asserting facts in his Proposed Amended Complaint that contradict those in his original Complaint. For example, they note that in his Proposed Amended Complaint Cadmus alleges that he overheard portions of the conversation between Nicholson and Cook while Nicholson filled out the criminal complaint, whereas in his original Complaint Cadmus had alleged that he was not allowed to stand near the magistrate's window during this conversation. Def. Resp. to Pl. Mot. to Am. 3, ECF No. 41. They also note that Cadmus has claimed for the first time in his Proposed Amended Complaint that he refused to give consent for officers to enter his home when they arrived in response to the June 9 incident. *Id.* at 3.

I do not find that these examples indicate bad faith by Cadmus. These newly alleged facts in the Proposed Amended Complaint supplement, rather than contradict, the facts alleged in the original Complaint. For example, Cadmus may have overheard parts of Cook's and Nicholson's conversation while standing away from the magistrate's window. In addition, Cadmus's new allegation that he objected to deputies entering his home, although omitted from his original Complaint, is not inconsistent with it. The Court should not penalize a *pro se* litigant's attempts to correct, through timely amendment, allegations that were incomplete or inartfully worded in his original complaint.

Defendants also, however, point to a more significant deviation from the original Complaint. Whereas Cadmus first alleged that he was charged with assaulting Carver and Fabrizio based on lies that Carver and Sirbaugh told the deputies, he now appears to assert that these charges were fully fabricated by Nicholson. The original Complaint and the Proposed Amended Complaint appear on their face to be contradictory. Cadmus states in the original

Complaint that as he was being arrested, "Nicholson and the other deputies allowed Carver and the boyfriend [Sirbaugh] to stand together by Cadmus' terminally ill mother and corroborate each other's self serving statements *which implicated Cadmus as assaulting both Carver and the boyfriend.*" Compl. ¶ 40 (emphasis added). The original Complaint also alleges that "Carver showed Defendant Nicholson a scratch on her upper arm," *id.* ¶ 30, which Nicholson later showed Cadmus when Cadmus asked if Nicholson had proof that he had assaulted anyone, *id.* ¶ 57.

Meanwhile, the Proposed Amended Complaint contains no allegations that anybody told the deputies that Cadmus had attacked Carver. Instead, Cadmus refers to Carver's affidavit, attached to the Proposed Amended Complaint, which states that she never told the deputies that Cadmus had assaulted her or Fabrizio. Proposed Am. Compl. ¶ 135; Carver Aff. ¶¶ 61–63, 65–68. The omission of previous allegations and addition of new allegations, if accepted, would substantially alter the nature of his claim. If, as Cadmus now alleges, the charges that he assaulted Carver and Fabrizio were not supported by witness statements,[16] but were instead fabricated by Nicholson, there could be serious doubt as to the existence of probable cause for his arrest and prosecution. *See Miller v. Prince George's Cty.*, 475 F.3d 621, 627 (2006) (noting that an arrest warrant is invalid if it is based on "material false statements"). It is therefore critical to determine whether Cadmus should be permitted to make these new allegations in an amended complaint.

---

[16] Although it is evident that Cadmus now asserts that deputies were never told he assaulted Carver, his argument with regard to the charge of assaulting Fabrizio is unclear. He acknowledges in the Proposed Amended Complaint that Fabrizio told the deputies that she was "bumped" by the door when Cadmus, Carver, and Sirbaugh went through it, Proposed Am. Compl. ¶ 138, but objects to Nicholson's characterizing this as Cadmus having "struck" Fabrizio with the door, *id.* ¶ 136. Although Nicholson's characterization implies a greater severity, under either version Fabrizio was hit by the door.

38

Facts in an amended complaint that are wholly inconsistent with facts alleged in the original complaint can be indicative of the plaintiff's bad faith and provide a basis for denying leave to amend. *See BLD Prods., LLC v. Remote Prods., Inc.*, 509 F. App'x 81, 82 (2d Cir. 2013); *Bradley v. Chiron Corp.*, 136 F.3d 1317, 1324–25 (Fed. Cir. 1998); *Little v. Liquid Air Corp.*, 952 F.2d 841, 846 (5th Cir. 1992), *reinstated in relevant part* 37 F.3d 1069, 1073 & n.8 (5th Cir. 1994); *Reddy v. Litton Indus., Inc.*, 912 F.2d 291, 296–97 (9th Cir. 1990). Of course, it is not always improper for a plaintiff to revise the alleged facts in an amended complaint. *See Goode v. Cent. Va. Legal Aid Soc'y, Inc.*, 807 F.3d 619, 627 & n.6 (4th Cir. 2015). For example, it may be necessary to change the facts in order to reflect newly discovered information that was unknown at the time the original complaint was filed. *See Scott v. Family Dollar Stores, Inc.*, 733 F.3d 105, 127 (4th Cir. 2013) (Wilkinson, J., dissenting) ("To be sure, [the plaintiff] must enjoy latitude in amending complaints . . . to incorporate factual material uncovered since the original filing."); *Beeck v. Aquaslide 'N' Dive Corp.*, 562 F.2d 537, 540-41 (8th Cir. 1977). This does not mean, however, that a plaintiff may fraudulently alter the facts from one complaint to the next simply because his "first theory of recovery is based on his own reading of . . . cases and it turns out that he misinterpreted how that theory would apply to the facts of his case." *Laber*, 438 F.3d at 428 (emphasis omitted).

Cadmus has offered numerous explanations as to why this change in his factual allegations was made in good faith. In his filings, Cadmus claims that the new allegations in the Proposed Amended Complaint are based on newly discovered information. Pl. Reply Br. 2–4; Cadmus Aff. ¶¶ 23–24, 28–30, 53, Nov. 15, 2015, ECF No. 47. Specifically, he claims that he had no idea what Carver did or did not tell the deputies (other than that Cadmus assaulted Sirbaugh) until he spoke with her after filing the original Complaint. Cadmus Aff. ¶¶ 24–25, 28–

39

29, Nov. 15, 2015. Cadmus also states that he was unaware that Nicholson had included these allegedly fabricated witness statements in the criminal complaint until he obtained a copy of that document. *Id.* ¶¶ 23, 26. Finally, Cadmus claims that he never meant to allege in his original Complaint that any of the witnesses had told the deputies that Cadmus assaulted Carver and Fabrizio. He acknowledges alleging in the original Complaint that Carver and Sirbaugh made "statements which implicated Cadmus as assaulting both Carver and the boyfriend," but claims this was a misstatement. *Id.* ¶¶ 15–16. Instead, he claims that he meant to say that Carver and Sirbaugh made statements "which implicated Cadmus, nevertheless, *he assaulted neither Carver nor the boyfriend.*" *Id.* ¶ 16 (emphasis in original).

I do not find these explanations credible. Even though Cadmus insists that he did not know what Carver did and did not tell deputies until he spoke to her after filing his original Complaint, this is at odds with the description of events set out in both the original and amended Complaints. In both Complaints, Cadmus clearly indicates that he witnessed the deputies' questioning of Carver, Sirbaugh, and Fabrizio. *See* Compl. ¶ 41. Many of Cadmus's objections to the manner in which the deputies handled the incident are because of claims that they treated Sirbaugh and Carver more courteously than they treated Cadmus and that they allowed Sirbaugh and Carver to corroborate each other's statements. No source for this information is apparent other than Cadmus's own observations of the deputies' questioning of Carver and Sirbaugh; thus, I cannot credit Cadmus's claim that Carver provided him with new information that he did not already know at the time he filed the original Complaint. Similarly, it is difficult to believe that the direct allegation in the original Complaint that Sirbaugh and Carver accused Cadmus of assaulting Carver was only a clerical error. Cadmus's explanation of what he meant to say does

40

not simply correct a typo—it is a substantive change that fundamentally alters the meaning of the original allegation.

Even if I accepted Cadmus's argument that he made these changes in good faith, his new theory, that Nicholson fabricated the charges of Cadmus assaulting Carver and Fabrizio, is undermined by contradictory facts within the Proposed Amended Complaint. The 911 dispatch log, which Cadmus attaches to and references in the Proposed Amended Complaint, reflects Sirbaugh's initial statements about the incident. The log includes Sirbaugh's statements that Cadmus "has assaulted several subjects there by pushing them around," and that Cadmus "did push the door into his mother and it struck her knee." Proposed Am. Compl. 140 (formatting modified from original). These statements provide an acceptable basis for the deputies to have formed a belief that Cadmus had assaulted Carver and Fabrizio. The Court need not accept Cadmus's assertion that Nicholson fabricated the charges out of whole cloth, as it is undermined by the facts included in his Proposed Amended Complaint and thus not a reasonable conclusion. *See Monroe v. City of Charlottesville*, 579 F.3d 380, 385–86 (4th Cir. 2009) (observing that courts "need not accept as true unwarranted inferences, unreasonable conclusions, or arguments." (internal quotation marks omitted)). For these reasons, I recommend that Cadmus's Motion for Leave to Amend Complaint be denied to the extent he alleges that Nicholson and other deputies fabricated the charges of assaulting and battering Carver and Fabrizio.

    *2.    Futility*

The Defendants also argue that the Court should deny Cadmus's Motion for Leave to Amend Complaint because any amendment would be futile. The Court may deny Cadmus's motion as futile if the Proposed Amended Complaint fails to state a claim, *Van Leer v. Deutsche Bank Sec., Inc.*, 479 F. App'x 475, 479 (4th Cir. 2012) (citing *United States ex rel. Wilson v.*

*Kellogg Brown & Root, Inc.*, 525 F.3d 370, 376 (4th Cir. 2008)), or otherwise fails to correct the deficiencies of the original Complaint, *Mitchell-Tracey v. United Gen. Title Ins. Co.*, 442 F. App'x 2, 7 (4th Cir. 2011). In making this determination, the Court asks whether the Proposed Amended Complaint would survive a motion to dismiss. *Elrod v. Busch Entm't Corp.*, 479 F. App'x 550, 551 (4th Cir. 2012) (per curiam) (citing *Katyle v. Penn Nat'l Gaming, Inc.*, 637 F.3d 462, 471 (4th Cir. 2011)).

      a.      Statute of Limitations

      The Defendants argue that some of the new claims brought in the Proposed Amended Complaint are time-barred by the statute of limitations. The parties do not dispute that the applicable limitations period in this suit is two years. *See Lewis v. Richmond City Police Dep't*, 947 F.2d 733, 735 (4th Cir. 1991) (noting that "[t]here is no federal statute of limitations for § 1983 claims," and therefore Virginia's two-year statute of limitations for personal injury claims is controlling). Therefore, any new claims raised in the Proposed Amended Complaint that accrued before October 7, 2013, are time-barred unless they relate back to the date Cadmus filed the original Complaint. *Wilkins v. Montgomery*, 751 F.3d 214, 223 (4th Cir. 2014).

      Rule 15(c)(1) sets out conditions in which an amendment relates back to the date of the original pleading. A new claim or defense will relate back if it "arose out of the conduct, transaction, or occurrence set out—or attempted to be set out—in the original pleading." Fed. R. Civ. P. 15(c)(1)(B). Although Cadmus asserts new theories and additional facts in his new claims, the Defendants have not identified, with any particularity, which of his new claims do not arise out of the events set forth in the original Complaint. Construing them liberally, each of the new claims relates to the investigation and Cadmus's arrest on June 9, 2013, subsequent visits by deputies to Cadmus's residence, and Cadmus's attempts to bring these incidents to the attention

of the FCSD. These same occurrences give rise to the claims in Cadmus's original Complaint. I therefore find that the new claims raised in the Proposed Amended Complaint relate back to the filing of the original Complaint and are not barred by the statute of limitations.[17]

### b. Immunities

It is appropriate to deny a motion for leave to amend as futile with regard to Defendants who are entitled to absolute immunity from suit. *See Schepp v. Fremont Cnty.*, 900 F.2d 1448, 1453 (10th Cir. 1990). For the reasons explained *supra*, Cook is immune from suit for damages on the basis of judicial immunity, and all Defendants named in their official capacities are immune based on the Eleventh Amendment. Cadmus has not alleged any new facts that would alter the analyses set forth above, and I find that no set of facts consistent with what he has pled so far would require a different outcome. Therefore, I recommend that the Court deny his motion for leave to amend with regard to these Defendants.

### c. Fourth Amendment Claims

Cadmus reasserts, with additional factual details, his Fourth Amendment and false arrest claims. He also asserts new claims regarding the June 9 incident. I consider each of these claims in turn.

### i. June 9 Unauthorized Entry

Cadmus argues that Nicholson and other deputies violated his Fourth Amendment right against unreasonable search and seizure by entering into his home, without a warrant and over his objection, after he and Sirbaugh had each called 911. "It is a 'basic principle of Fourth

---

[17] I note that the Defendants' arguments regarding limitations and relation back pertain only to the subject matter of Cadmus's new claims, and not to the substitution of new Defendants in place of previously unidentified John Does. These are distinct issues that require consideration of different factors, *compare* Fed. R. Civ. P. 15(c)(1)(B), *with* R. 15(c)(1)(C), and therefore I cannot treat the Defendants' limitations argument as having raised the latter issue.

43

Amendment law that searches and seizures inside a home without a warrant are presumptively unreasonable.'" *Brigham City v. Stuart*, 547 U.S. 398, 403 (2006) (quoting *Groh v. Ramirez*, 540 U.S. 551, 559 (2004)). As argued by the Defendants, an exception to this presumption is the existence of exigent circumstances, including "the need to assist persons who are seriously injured or threatened with such injury." *Id.*

Cadmus states that the deputies had no reason to enter the house because the people involved in the altercation—Cadmus, Sirbaugh, and Carver—were already outside in front of the house when the deputies arrived. Proposed Am. Compl. ¶¶ 63, 65. Fabrizio, however, was not in front with the others when deputies arrived, and I find that it would have been reasonable for the deputies to believe that she needed medical attention. The 911 dispatch log reflects claims, made by either Sirbaugh or Cadmus, that (1) Cadmus had assaulted people in the house by pushing them around, (2) Cadmus "did push the door into his mother and it struck her knee," and (3) Fabrizio was terminally ill and high on medications. Proposed Am. Compl. 139–40 (formatting modified from original). In addition, Sirbaugh told dispatchers that Cadmus may have been on drugs, *id.* at 140, while Cadmus told them that Carver was on drugs, *id.* at 139. Even though Cadmus alleges that he and Sirbaugh told dispatchers that first responder services were unnecessary, I find that these facts were still sufficient to create a reasonable belief that Fabrizio needed emergency assistance. *Cf. Pleasants v. Town of Louisa*, 524 F. App'x 891, 895–96 & n.3 (4th Cir. 2013) (acknowledging that police may need to assess independently the welfare and safety of alleged victims of domestic violence and noting that this may give rise to exigent circumstances). Because she was not in front of the house with the others when officers arrived, it was permissible for them to enter the residence to check on her welfare. The facts alleged in the Proposed Amended Complaint establish the reasonableness of the officers' actions.

44

## ii.    Arrest

In his Proposed Amended Complaint, Cadmus reasserts his claim that he was arrested in violation of the Fourth Amendment. As with his original Complaint, however, I find that he has not pled facts that establish that the officers lacked probable cause for the arrest. Cadmus has not alleged any new facts that lend further support to his claim, but instead asserts that Nicholson and the other deputies were never told that he had assaulted Carver or Fabrizio. For the reasons explained *supra*, I do not find this conclusion to be reasonable. Because the 911 log shows that the officers were told that Cadmus had assaulted Carver and Fabrizio, and because Cadmus still alleges that Carver showed the officers a visible injury on her upper arm, Proposed Am. Compl. ¶¶ 139–40, I find that the facts alleged in the Proposed Amended Complaint show that there was probable cause for Cadmus's arrest. Thus, amendment of Cadmus's claims arising from the June 9 events is futile.

## iii.    Subsequent Visits

Cadmus also reasserts his Fourth Amendment claims with regard to the visits by officers to his home that occurred subsequent to his June 9, 2013, arrest. Cadmus's allegations regarding the August 2013 warrantless search of his home are too vague and confusing for the Court to evaluate his claim on its merits. Cadmus asserts that he arrived home and found Nicholson, Kittoe, and other deputies conducting a search for a dead body, and that they continued searching after they found out that the person they were looking for was alive. Proposed Am. Compl. ¶ 200. A report of a dead body inside a house can give officers a reasonable belief that an emergency is taking place and justify a warrantless entry. *United States v. Stafford*, 416 F.3d 1068, 1074 & n.3 (9th Cir. 2005).

45

Further complicating matters is the issue of consent. Consent to search is another exception to the Fourth Amendment's warrant requirement. *United States v. Ortiz*, 669 F.3d 439, 445 (4th Cir. 2012). Cadmus was not present to give consent initially for the officers to enter and search the house, but claims that he signed a written consent to search after he arrived. Although there is no indication that this written consent applied retroactively, it would suffice to authorize any subsequent search so long as it was given voluntarily. *Cf. United States v. Howe*, 414 F. App'x 579, 581–82 (4th Cir. 2011) (per curiam) (noting that voluntary consent to search given after officers have already entered the premises illegally may be "an intervening act of free will" that validates a subsequent search). Cadmus states without elaboration that he was "pressured" into giving consent. Proposed Am. Compl. ¶ 200. Whether consent was voluntarily given, however, is a fact specific inquiry that considers the totality of the circumstances. *United States v. Robertson*, 736 F.3d 677, 688 (4th Cir. 2013). "The relevant determination regarding voluntariness is whether government agents have overborne [the plaintiff's] will or left his 'capacity for self-determination critically impaired.'" *United States v. Alexander*, 391 F. App'x 274, 275 (4th Cir. 2010) (quoting *Schneckloth v. Bustamonte*, 412 U.S. 218, 225 (1973)). A conclusory allegation of feeling pressured is insufficient to show that Cadmus's will was overborne. Having pled that he consented to the officers' search, and having failed to show that his consent was not voluntary, Cadmus fails to state a claim that any search conducted subsequent to that consent was unlawful.

Cadmus complains of two other entries onto his property. As to the October 31, 2013, visit, the alleged facts still do not even implicate the Fourth Amendment. The deputies did no more than approach the front door to serve a summons, albeit at 3:00 a.m., and knock. As to the May 2015 visit, Cadmus's allegations, while sparse, are sufficient to state a claim for an

46

unlawful entry. He alleges that an officer, John Doe, came into his house without consent to serve a summons. An officer's entry into a residence, if not authorized by a warrant or exception to the warrant requirement, may constitute a violation of the Fourth Amendment. *Covey*, 777 F.3d at 195. Accordingly, this claim is not futile.

Although most of Cadmus's Fourth Amendment claims, as pled, are deficient, I find that amendment of his allegations could cure the present defects such that he may be able to state a claim for relief. *See Goode*, 807 F.3d at 626–27. Thus, while I recommend denying leave to amend on the current Proposed Amended Complaint, I also recommend that the Court allow Cadmus another opportunity to state sufficient allegations as to his Fourth Amendment claims.

### d. Malicious Prosecution

The Proposed Amended Complaint reasserts Cadmus's federal and state claims for malicious prosecution and also includes a related claim for conspiracy between Nicholson and Cook.[18] Most of the facts relevant to these claims are the same as in the original Complaint, although the Proposed Amended Complaint also contains more detailed allegations as to Nicholson's and Cook's actions prior to the issuance of the arrest warrant. Cadmus claims that in filling out the criminal complaint, Nicholson intentionally misrepresented statements made to him while he was investigating the domestic incident. First, he notes that Nicholson wrote in the complaint that Cadmus told him that when Sirbaugh prevented him from going out the back door, Cadmus "walked through him." Proposed Am. Compl. ¶ 132. Cadmus argues that Nicholson mischaracterized his statement that he escaped from Sirbaugh and "walked through the back door." *Id.* ¶ 133. He also claims that Nicholson falsely stated that Carver had told him

---

[18] Although Count III is brought under the heading "Conspiracy to Unlawfully Arrest and Unlawful Arrest," Proposed Am. Compl. 42, the allegations in that Count are more accurately characterized as asserting a claim for malicious prosecution and related conspiracy.

that Cadmus assaulted her, Sirbaugh, and Fabrizio, and that she scratched her arm when this happened, even though Cadmus and Carver now claim that she never said this. *Id.* ¶¶ 134–35, 139–40. Furthermore, he claims that Nicholson falsely stated that Fabrizio told him Cadmus had struck her with the door, even though Cadmus heard her say that the door only had swung open and bumped her in the knee. *Id.* ¶¶ 136–37. Finally, the Proposed Amended Complaint asserts that Nicholson falsely claimed that Cadmus had no visible injuries, even though Cadmus claims that he did have injuries, but was not given an opportunity to show them to Nicholson. *Id.* ¶¶ 141–42 & n.23.

An arrest warrant is not supported by probable cause if it is issued pursuant to an affidavit "that was deficient because it was dishonest." *Miller*, 475 F.3d at 627. Not all errors in a warrant affidavit preclude a finding of probable cause, however. Instead, a plaintiff must show that the officer who filled out the warrant made material false statements or omitted material facts. *Id.* Furthermore, the officer must have done so deliberately or with "reckless disregard" of whether the statements were false or the omission of facts made the affidavit misleading. *Id.* Accepting Cadmus's allegations as true, I do not find that he has made this showing.

Cadmus's version of events is simply not that different from those described in the criminal complaint. Furthermore, the 911 log makes clear that officers were told that Cadmus had assaulted Carver and Sirbaugh and struck Fabrizio with the door. The worst that can be said for Nicholson's account in the criminal complaint is that he misattributed the source of this information by stating that Carver and Fabrizio, rather than Sirbaugh, had said it. This is not enough to constitute a material false statement or omission, and therefore does not undermine a finding of probable cause to issue the arrest warrant. Likewise, even if I accept that Nicholson's statement that Cadmus did not have visible injuries was intentional and dishonest, it is not

48

material to the question of whether Cadmus assaulted Carver or Fabrizio. There is no dispute from any of the parties that Cadmus was involved in a physical confrontation with Sirbaugh, in which he may have been injured. Furthermore, Nicholson did not charge Cadmus with assaulting Sirbaugh, making the presence or absence of any visible injuries to Cadmus particularly irrelevant. For the same reason, whether Nicholson improperly stated that Cadmus walked through Sirbaugh instead of that he escaped from Sirbaugh and walked through the door is irrelevant.

In addition, the facts alleged in the Proposed Amended Complaint are insufficient to show a conspiracy between Nicholson and Cook. Cadmus claims that he overheard a few words spoken between Nicholson and Cook (although he does not specify who the speaker was) and that he observed Nicholson showing the criminal complaint to Cook and Cook nodding her head affirmatively. Proposed Am. Compl. ¶¶ 128–30. From this, Cadmus concludes that Cook instructed Nicholson how to write the complaint in a way that would support a finding of probable cause. *Id.* ¶¶ 127, 309. This is not, however, a reasonable inference to draw from these limited facts. Instead, Cadmus's allegation—that Cook and Nicholson deliberately agreed to manipulate witness statements in order to fabricate charges against him—seems to be based entirely on his assumption that Cook and Nicholson acted in bad faith because they disliked him as an individual. The Court is not required to accept such a speculative conclusion as true. For these reasons, I find that Cadmus's claims for malicious prosecution and related conspiracy are futile. Moreover, Cook has judicial immunity from these claims.

        *e.*    *Equal Protection*

Cadmus also reasserts his equal protection claim, with a related claim for conspiracy that includes all of the Defendants. With regard to these claims, the Proposed Amended Complaint

49

suffers from the same deficiencies as the original Complaint. Again, Cadmus does not identify

other, similarly situated individuals who were treated differently from him. Furthermore, he has

not pled any facts that tend to show his treatment by the Defendants was arbitrary or irrational.

Finally, for the reasons discussed *supra*, Cadmus's theory that the Defendants made any sort of

agreement to violate his rights is not supported by the allegations and implausible. I therefore

find that his claim for equal protection or conspiracy is futile.

####        f.        Retaliation

For the first time, Cadmus asserts a claim for retaliation in violation of his First

Amendment rights. "'The First Amendment right to free speech includes not only the affirmative

right to speak, but also the right to be free from retaliation by a public official for the exercise of

that right.'" *Ruttenberg v. Jones*, 283 F. App'x 121, 130 (4th Cir. 2008) (per curiam) (quoting

*Suarez Corp. Indus. v. McGraw*, 202 F.3d 676, 685 (4th Cir. 2000)). A claim for First

Amendment retaliation must satisfy three elements. First, the plaintiff must show that the speech

at issue was protected. *Id.* Second, the retaliatory action must have a chilling effect, adversely

affecting the plaintiff's protected speech. *Id.* The standard for this element is objective—it is

satisfied only if "a person of reasonable firmness in [the plaintiff's] situation would have been

chilled." *Id.* Finally, the plaintiff must establish a causal relationship between the speech and the

retaliation. *Id.* The burden for this third element is high. Cadmus must show that "'but for' the

protected speech, the alleged retaliatory conduct would not have occurred.'" *Id.* at 131 (citing

*Huang v. Bd. of Governors of the Univ. of N.C.*, 902 F.2d 1134, 1140 (4th Cir. 1990)).

Cadmus has not pled sufficient facts to establish a claim for retaliation. First, as the

Defendants note, the Proposed Amended Complaint does not make clear what protected speech

Cadmus alleges to have been the subject of retaliation. Cadmus includes, as an exhibit to the

Proposed Amended Complaint, a number of news reports and other materials concerning his advocacy on various civil rights issues. *See generally* Proposed Am. Compl. ¶¶ 178–204. Much of this activity, however, took place after most of the events in question in this case had occurred. *See, e.g.*, *id.* at ¶¶ 178–82, 184–87, 193. Similarly, the Court cannot determine whether a person of reasonable firmness in Cadmus's position would have been chilled by the Defendants' alleged retaliation because the Proposed Amended Complaint is so vague as to which actions it alleges to have been retaliatory.

In addition, Cadmus has not alleged facts showing that his protected speech was a "but for" cause of any retaliation. Notably, the only Defendant whose retaliatory motive is discussed in any detail is Nicholson—there are no factual allegations (aside from broad, conclusory assertions) suggesting that any of the other Defendants were aware of Cadmus's protected speech and took action against Cadmus because of that speech. As to Nicholson, Cadmus claims that he made his retaliatory intent clear as he drove Cadmus to the NRADC after the June 9 incident. Pl. Reply Br. 11–12. Cadmus alleges that Nicholson stated he was aware of Cadmus's activism, including strikes and lawsuits against the City of Winchester and its officials, and recalled having arrested Cadmus on a previous occasion. Proposed Am. Compl. ¶¶ 105–08. Cadmus argues that Nicholson gave away his retaliatory intent when Nicholson told him, "Mr. Cadmus, I'm going to hold you responsible now because you think you can fight the system and not be held accountable for your behavior." *Id.* ¶ 109.

Arguably, these allegations show that Cadmus's protected speech may have been *a* factor that motivated Nicholson's actions. This does not, however, establish the necessary level of causation. It is simply not plausible that despite having received a 911 call accusing Cadmus of assault and battery and having dealt with similar accusations against Cadmus in the past,

51

Nicholson would not have arrested him on these charges *but for* Nicholson's desire to retaliate against him for engaging in protected speech activities. To the contrary, Cadmus's Proposed Amended Complaint shows that Cadmus and Sirbaugh initiated the interaction with police on June 9 by calling 911, and Nicholson investigated the report of violence and reasonably determined that probable cause existed for Cadmus's arrest. These allegations provide a basis for Nicholson's actions other than retaliation. For these reasons, I find that Cadmus's claim for retaliation is futile.

g.     *Municipal, Supervisory, and Bystander Liability*

Cadmus now asserts claims under the theories of supervisory, municipal, and bystander liability. Although the Proposed Amended Complaint uses these theories somewhat interchangeably, there are important distinctions. A municipality can be found liable in a § 1983 suit for the torts of its employees if those employees acted pursuant to municipal policy or custom. *Monell*, 436 U.S. at 690. Although Cadmus asserts a similar theory of liability in the Proposed Amended Complaint, the label of "municipal liability" for this claim seems to be a misnomer because he has not named a municipal defendant. As Cadmus concedes, Pl. Reply Br. 7, the Sheriff's Department "is not a cognizable legal entity separate from the Sheriff in his official capacity and the . . . government of which this 'office' is simply an agency." *Revene v. Charles Cty. Comm'rs*, 882 F.2d 870, 874 (4th Cir. 1989). Furthermore, he has not expressly included Frederick County as a Defendant in the Proposed Amended Complaint, although he argues that his suit against Williamson in his official capacity should be construed as a suit against the County or its Board of Supervisors. Pl. Reply Br. 9. For reasons explained throughout this opinion, the connection between Williamson and the County is tenuous. In Virginia, a sheriff has inherent policymaking authority that is independent of the local government. *Strickler v.*

*Waters*, 989 F.2d 1375, 1390 (4th Cir. 1993). Thus, any policy or custom created by Williamson pursuant to this authority would be attributable only to his department, not to the County.[19]

Supervisory and bystander liability, meanwhile, concern the culpability of individual Defendants for constitutional injuries inflicted by others. As with the original Complaint, these claims fail as an initial matter with regard to most of Cadmus's alleged injuries because Cadmus has not stated a claim for a constitutional violation that caused those injuries. Furthermore, Cadmus has not established the requisite level of culpability for the Defendants named in these counts. First, he alleges that the Defendants developed and maintained policies, procedures, customs, and practices that caused his rights to be violated. Proposed Am. Compl. ¶¶ 299–300. Similar to a municipality, an individual supervisor may be liable for creating policy that results in constitutional injury when a subordinate executes that policy. *Taylor v. Pulliam*, No. 7:14cv641, 2015 WL 4920788, at *6 (W.D. Va. Aug. 18, 2015); *Brown v. Mitchell*, 308 F. Supp. 2d 682, 702–03 (E.D. Va. 2004).

Cadmus has not, however, identified with any specificity the policy or custom that led to his alleged injuries. Cadmus has attached numerous policies for Williamson's department, along with Cadmus's own annotations, as exhibits to the Proposed Amended Complaint, *see generally* Proposed Am. Compl. 49–92, 102–36, but he has not explained how any of these policies would encourage illegal behavior. Furthermore, Cadmus seems to conflate decisionmaking on a case-by-case basis with creation of policy. For example, he argues that Williamson has delegated policymaking authority regarding citizen complaints to Singhas. Pl. Reply Br. 10. It is inaccurate, however, to claim that Singhas creates policy for the department simply by exercising

---

[19] I do not address at this point whether Williamson did or could exercise any policymaking authority delegated to him by the County because Cadmus has not identified or alleged any such delegation of authority.

his discretion to screen out complaints that he finds groundless. On the other hand, it would be accurate to describe the department's practice of investigating complaints against its own officers, which Cadmus argues "encourages lawlessness and disregards citizen's [sic] federal rights," *id.*, as a policy, practice, or custom. For reasons explained below, Cadmus has not shown that the department's procedure for processing complaints was a legally sufficient cause of his alleged injuries.

Cadmus claims that Williamson and other supervisory Defendants are liable for failing to investigate adequately his complaints and to punish the alleged wrongdoers. Proposed Am. Compl. ¶¶ 300–01, 306; Pl. Reply Br. 10–11. A supervisory official does not have an affirmative duty to investigate complaints of wrongdoing by his subordinates. *Jackson*, 771 F. Supp. 2d at 603 (citing *Kittoe*, 229 F. Supp. 2d at 538). Similarly, supervisors cannot be held liable for a constitutional violation simply because they failed to take disciplinary action after learning of the violation. *Danser*, 772 F.3d at 349–50. The only way these actions (or lack thereof) are relevant to Cadmus's claim is if they show deliberate indifference to a pattern of subordinate misconduct that can give rise to liability for later violations.

It is not necessary to decide whether the Defendants' failure to take investigatory or disciplinary steps demonstrated deliberate indifference, however, because Cadmus has not shown a link between this failure and subsequent alleged violations. The violations that he alleges took place after the June 9 incident are different in kind from the actions that occurred on that date and which he reported to the department. All of the incidents that Cadmus describes as occurring after June 9 were allegedly illegal entries onto his property and into his home. Although Cadmus now alleges that an illegal entry also took place on June 9, he did not say anything about this in his complaint to the FCSD. *See* Proposed Am. Compl. 159–62. He also has not alleged that he

raised any complaint about those subsequent incidents with officials at the FCSD. I will not find the Defendants liable for failing to prevent alleged violations if they had no notice that there was a risk that those types of violations would occur.

In addition, Cadmus claims that the Defendants are liable for failing to train adequately their subordinates. Proposed Am. Compl. ¶¶ 300–01. "[T]he inadequacy of police training may serve as the basis for § 1983 liability only where the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact." *City of Canton v. Harris*, 489 U.S. 378, 388 (1989). Under a failure-to-train theory, as in other contexts, a supervisor must have been aware of a prior pattern of misconduct in order to have been deliberately indifferent to the risk of constitutional violations. *Rivera v. Dickenson*, No. 7:14cv573, 2015 WL 5565273, at *3 (W.D. Va. Sept. 21, 2015). Cadmus has not shows a pattern of misconduct similar to the complained-of incidents of false arrest and unauthorized entry into his residence. Nor has Cadmus alleged "a direct causal link . . . between a specific deficiency in training and the particular violation alleged." *Buffington v. Baltimore Cty.*, 913 F.2d 113, 122 (4th Cir. 1990) (citing *Canton*, 489 U.S. at 391). Instead of identifying a specific deficiency, Cadmus urges the Court to accept that the deputies' training was necessarily deficient simply because the violations alleged in his Complaint occurred. This is insufficient to state a claim for supervisory liability. *See Revene*, 882 F.2d at 875 (dismissing the plaintiff's claim of inadequate training where the plaintiff failed to "suggest any specific deficiencies in training . . ., or that the incident here alleged was anything but an aberrational act by an individual officer").

Finally, Cadmus has also failed to plead facts to establish that any of the named Defendants are responsible for his alleged injuries under a theory of bystander liability, or failure to intercede. A bystanding officer will be held responsible for the illegal acts of his fellow

55

officers if he "(1) knows that a fellow officer is violating an individual's constitutional rights; (2) has a reasonable opportunity to prevent the harm; and (3) chooses not to act." *Randall*, 302 F.3d at 204. As to three of the Defendants named in this count—Williamson, Singhas, and Heflin—Cadmus has completely failed to allege any facts showing that they were aware of a violation by fellow officers and had a reasonable opportunity to intervene. Cadmus does not allege that these Defendants were present during any of the incidents that he claims gave rise to his injuries; thus, they would not have been able to prevent these incidents or even have known about them until after the fact. The only Defendant who may have had any opportunity to intervene and prevent one of the alleged violations was Kittoe, who was present throughout the August 2013 search of Cadmus's home. Proposed Am. Compl. ¶¶ 196–200. As explained *supra*, however, Cadmus has not pled facts that state a claim regarding that incident.

### h. *Intentional Infliction of Emotional Distress*

Finally, Cadmus reasserts his claim for intentional infliction of emotional distress. He has failed to correct the deficiencies of the original Complaint, however. Although Cadmus has pled facts in more detail, these still do not rise to the level of outrageous or intolerable conduct necessary to support a claim for intentional infliction of emotional distress. The fact that Cadmus subjectively believes these actions to be outrageous does not make them so.

### III. Conclusion

The claims in Cadmus's original Complaint, ECF No. 2, fail to state a cause of action for which the Court can grant relief, and they should be dismissed under Rule 12(b)(1) and (6). I recommend that the presiding District Judge **DISMISS WITH PREJUDICE** all claims against Aimee Cook in both her individual and official capacities, and all claims for damages against all

other Defendants in their official capacities, as these Defendants are protected by absolute immunity; and **DISMISS WITHOUT PREJUDICE** all other claims.

In addition, Cadmus's Proposed Amended Complaint, ECF No. 29-1, save for the May 2015 entry into his residence, fails to correct the deficiencies of the original Complaint; therefore, I recommend that leave to file the Proposed Amended Complaint be **DENIED**. Cadmus may still be able to plead facts that state a cause of action for which relief can be granted, except with regard to claims which are barred by absolute immunity. I therefore recommend that the presiding District Judge **DENY in part** Cadmus's Motion for Leave to Amend his Complaint, ECF No. 29, with regard to claims that are dismissed with prejudice, and **GRANT in part** that motion with regard to all other claims, with instructions to file a new amended complaint.

### Notice to Parties

Notice is hereby given to the parties of the provisions of 28 U.S.C. § 636(b)(1)(C):

> Within fourteen days after being served with a copy [of this Report and Recommendation], any party may serve and file written objections to such proposed findings and recommendations as provided by rules of court. A judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made. A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge may also receive further evidence or recommit the matter to the magistrate judge with instructions.

Failure to file timely written objections to these proposed findings and recommendations within 14 days could waive appellate review. At the conclusion of the 14 day period, the Clerk is directed to transmit the record in this matter to the Honorable Michael F. Urbanski, United States District Judge.

The Clerk shall send certified copies of this Report and Recommendation to all counsel of record and unrepresented parties.

ENTER: February 1, 2016

Joel C. Hoppe
United States Magistrate Judge